# APPENDIX
# TAB 1

Filed in The District Court
of Travis County, Texas

JUN 1 6 2015

At_____ 10:50 ᴀM.

Velva L. Price, District Clerk

CAUSE NO. D-1-GN-15-000785

| | | |
|---|---|---|
| OAK MORTGAGE GROUP, INC., MICHAEL H. NASSERFAR, MICHAEL E. TASK, and TYCORD R. GOSNAY, | § § § § | IN THE DISTRICT COURT |
| Plaintiffs / Counter-Defendants, | § § | |
| V. | § § | OF TRAVIS COUNTY, TEXAS |
| AMERIPRO FUNDING, INC., | § § § | |
| Defendant / Counter-Plaintiff. | § | 345ᵗʰ JUDICIAL DISTRICT |

## TEMPORARY INJUNCTION ORDER

Ameripro Funding, Inc.'s ("Ameripro") Application for Temporary Injunction, set forth in Defendant and Counter-Plaintiff Ameripro Funding, Inc.'s Counterclaim and Sworn Application for Temporary Injunction and Permanent Injunction, came on for hearing before the Court on May 26 and May 27, 2015. Based on the pleadings, the evidence submitted, and the argument of counsel, the Court finds that Ameripro is entitled to entry of a temporary injunction against Plaintiffs and Counter-Defendants Michael H. Nasserfar ("Nasserfar"), Michael E. Task ("Task"), Tycord R. Gosnay ("Gosnay"), and Oak Mortgage Group, Inc. ("Oak Mortgage") as set forth below.

The Court finds that, based upon the evidence, Ameripro has met its burden to establish that it has a probable right of recovery and likelihood of success on the merits on its claims for misappropriation of trade secrets and confidential and proprietary information, conversion, breach of fiduciary duty, tortious interference with contract, and breach of contract, in that Counter-Defendants Nasserfar, Task, Gosnay, and Oak Mortgage have attempted to permanently destroy Ameripro documents and files, and have taken from Ameripro's computer network and premises confidential and proprietary information belonging to Ameripro (including but not



004074910



limited to Ameripro's pricing information, general ledgers, profit and loss statements, loan profitability reports, statements of income, customer and referral lists and contact information, builder preferences or builder contacts or cell phone numbers, pro formas, concession fees, borrower information, transaction details, templates, loan set-up sheets, e-mails exchanged using Ameripro servers, correspondence, and other information that had been stored on Ameripro's computer network or in Ameripro offices) (hereinafter "Ameripro Information").

The Court further finds, based upon the evidence, that Ameripro has met its burden to establish that Ameripro will suffer a probable, imminent, and irreparable injury until trial on the merits, absent entry of a temporary injunction, in that Ameripro has shown that the full extent of injury to Ameripro if this Order did not issue would be very difficult to ascertain or quantify, a future award of damages would not fully or adequately compensate Ameripro, Ameripro does not have a legal remedy that is adequate in lieu of injunctive relief, and even to the extent that a legal remedy might be available, its redress will be limited and inadequate. The Court further finds that the balancing of the equities as between Ameripro and Counter-Defendants Nasserfar, Task, Gosnay, and Oak Mortgage favors the issuance of this temporary injunction, and that this temporary injunction is necessary to preserve the status quo between the parties pending trial on the merits.

IT IS THEREFORE ORDERED that Counter-Defendants Nasserfar, Task, Gosnay, and Oak Mortgage, employees of Oak Mortgage, and other entities acting or purporting to act in participation or concert with them, are commanded forthwith to:

(i)     within three (3) days of this Order, provide to Roy Rector of R3 Digital Discovery (Ameripro's forensic computer expert) forensic images of all original source media that contains or did contain Ameripro files or information (including but

2

224

not limited to flash drives, disks, USB storage devices, external storage devices, hard drives, cell phones, and laptops) (hereinafter collectively the "Media") in the possession, custody, or control of Nasserfar, Task, and Gosnay (including in the possession, custody, or control of their attorneys and/or Lee Whitfield of Digital Discovery), including all bit by bit forensic copies or images, however and whenever made, including but not limited to, all such forensic images stored in any of the following formats: E01, L01, dd, s01, ad1 and/or gho. The forensic images of the Media may be reviewed and analyzed by Roy Rector, and by outside counsel of Ameripro at Graves Dougherty Hearon & Moody ("Graves Dougherty") as Attorneys' Eyes Only under the Agreed Protective Order, and Graves Dougherty may show forensic images to in-house counsel for Ameripro so long as the images relate to Ameripro. The Media from which the forensic images are made will be preserved and held by Counter-Defendants' attorney, Charles Bundren, as Attorneys' Eyes Only under the Agreed Protective Order. If the parties' counsel can agree upon which information contained in the Media belongs to the respective parties, without Court intervention, then the parties are authorized to return the other party's information to it or him. Ameripro will provide to Mr. Bundren forensic images of the three laptops that Counter-Defendants Nasserfar, Task, and Gosnay returned to Ameripro on January 15-16, 2015 (it was stated on the record that those forensic images were provided to Mr. Bundren on May 28, 2015 at the hearing).

(ii)    desist and refrain from, directly or indirectly, using any of the Ameripro Information, including but not limited to any of the Ameripro Information

3

225

contained on the Media, and from copying, purging, modifying, or destroying any Ameripro Information (except to make the forensic images for Roy Rector as set forth above in this Order).

(iii)    desist and refrain from, directly or indirectly, soliciting business from Brohn Homes, Seaholm Residences, and Clark Wilson Builders.

IT IS FURTHER ORDERED that Ameripro remove any reference to Michael Nasserfar (e.g., videos, likenesses) from the Ameripro website.

IT IS FURTHER ORDERED that the Parties mediate this case no later than sixty (60) days from the date of this Order. Such mediation shall take place in Austin, Travis County, Texas and shall be conducted by a licensed attorney agreed upon by the Parties. Costs of the mediation shall be shared equally by Counter-Defendants and Ameripro.

IT IS FURTHER ORDERED that this matter is set for trial on the merits on February 22, 2016, in the Travis County Courthouse, 1000 Guadalupe Street, Austin, Travis County, Texas 78701.

In accordance with Rule 684 of the Texas Rules of Civil Procedure, the Clerk shall issue such temporary injunction order upon Ameripro filing with the Court a bond executed by it and adequate sureties in the amount of $10,00.00, payable to Counter-Defendants, approved and conditioned as the law requires and such bond shall remain on file with the Court, as bond for this Temporary Injunction Order. The Clerk of the Court shall forthwith issue a temporary injunction in conformity with the law and the terms of this order.

SIGNED this _15_ day of _June_, 2015 at _3_:_15_ a.m. (p.m.).

_[signature]_

HON. GISELA D. TRIANA
JUDGE PRESIDING

4

APPROVED:

GRAVES, DOUGHERTY, HEARON & MOODY, P.C.
401 Congress, Suite 2200
Austin, Texas 78701
(512) 480-5764/Fax (512) 536-9908

By: _____
        Susan P. Burton
        State Bar No. 03479350
        sburton@gdhm.com
        Eric G. Behrens
        State Bar No. 02050700
        ebehrens@gdhm.com

ATTORNEYS FOR DEFENDANT
AMERIPRO FUNDING, INC.


APPROVED AS TO FORM:

WM. CHARLES BUNDREN & ASSOCIATES LAW GROUP, PLLC
2591 Dallas Parkway, Suite 300
(214) 808-3555/Fax (972) 624-5340

By: _____
        Wm. Charles Bundren
        State Bar No. 03343200
        Charles@bundrenlaw.net

ATTORNEYS FOR PLAINTIFFS  OAK MORTGAGE GROUP, INC.,
MICHAEL H. NASSERFAR, MICHAEL E. TASK AND TYCORD R. GOSNAY

5

227

# APPENDIX
# TAB 2

REPORTER'S RECORD
VOLUME 2 OF 4 VOLUMES
TRIAL COURT CAUSE NO. D-1-GN-15-000785
APPELLATE COURT CAUSE NO. 03-15-00416-CV

OAK MORTGAGE GROUP, INC.,      )  IN THE DISTRICT COURT
MICHAEL H. NASSERFAR, MICHAEL  )
E. TASK, and TYCORD R.         )
GOSNAY,                        )
                               )
                               )
        Plaintiffs,            )
                               )
VS.                            )  TRAVIS COUNTY, TEXAS
                               )
                               )
AMERIPRO FUNDING, INC.,        )
                               )
                               )
                               )
        Defendant.             )  345TH JUDICIAL DISTRICT


----------------------------------

TEMPORARY INJUNCTION

----------------------------------


On the 26th day of May, 2015, the following proceedings came on to be heard in the above-entitled and numbered cause before the Honorable Gisela D. Triana, Judge presiding, held in Austin, Travis County, Texas;

Proceedings reported by machine shorthand.

have any value to us.

We'd already began that process. We imaged all the devices. We'd already searched the devices to try to find anything that could conceivably be argued by AmeriPro as being something that they claim is their property, although we dispute that, and return it. And that's the reason on April the 27th we returned over 20,000 -- I think it's over 20,000 electronic files to them which they didn't even look at in their forensic expert's deposition.

After your order, we'd already imaged the -- imaged the drives. We began searching for and developing search criteria to find the electronic files. We copied, moved those electronic files by image from the devices over to a drive. So they were all returned, and I overnighted that to Ms. Burton on -- on May the 14th, two days after the order was entered. Then I received a letter complaining saying, "Oh, it doesn't have the metadata in it." Well, it does have the metadata in it, and metadata would identify that Mr. Nasserfar was the author. It would identify the date Mr. Nasserfar created a lot of those documents. It would also identify dates that they were revised. So we went back and we made another disc, and I sent that on May 19th, overnighted it again. So all of the electronic files that they had any concept of any argument at all that belonged to them, anything we could find that conceivably be something they would argue about, it's all

MS. BURTON:  Thank you.

THE COURT:  You're welcome.

CHAD OVERHAUSER,

having been first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MS. BURTON:

Q.    Mr. Overhauser, would you please tell the Court your full name.

A.    Chad Michael Overhauser.

Q.    Where are you employed?

A.    AmeriPro Funding.

Q.    Would you --

THE COURT:  I'm sorry.  Did you spell that for the court reporter?

THE WITNESS:  I did not.

THE COURT:  Would you spell that for the court reporter?

THE WITNESS:  Last name?

THE COURT:  Yes.

THE WITNESS:  O-V-E-R-H-A-U-S-E-R.

THE COURT:  Thank you.

Q.    (BY MS. BURTON)  What's your title at AmeriPro?

A.    President.

Q.    And what is the business of AmeriPro?  What does AmeriPro do?

A.   Residential mortgage loans.

Q.   How long has AmeriPro been in business?

A.   13 years -- or 12 years.  Sorry.

Q.   Were you responsible for AmeriPro being started?

A.   Yes.

Q.   In what capacity?

A.   I was the founder and president of the company.

Q.   And where is it located?

A.   8300 North Mopac.

Q.   Here in Austin?

A.   In Austin, Texas.

Q.   Has it always been an Austin business?

A.   Yes.

Q.   Any other offices other than in Austin?

A.   Yes.  We have an office -- oh, other than Austin?

Q.   Yes, sir.

A.   I'm sorry.  Yes.  We have offices in Dallas, Houston, Oklahoma, state of Colorado, Florida, state of Arizona, and state of California.

Q.   Okay.  And the corporate office is here in Austin?

A.   Correct.

Q.   You said you're the president of AmeriPro.  Generally describe what you do on a day-to-day basis at AmeriPro.

A.   I am in charge of the day-to-day operations of the company.

A. Yes, it does.

Q. Tell the Court -- I mean, you said AmeriPro is a residential mortgage company, but can you describe it any more? What would differentiate AmeriPro from other residential mortgage companies?

A. We're a residential mortgage lender, but we also operate as a mortgage banker, which is a coined phrase in the industry, meaning that we both go out and originate loans for customers and clients, we process the loans, we underwrite the loans, we close and fund them many times in our own name and in some cases we service the loans also.

Q. You're aware -- you know -- you know Mr. Nasserfar, Mr. Task, and Mr. Gosnay, correct?

A. Yes, I do.

Q. And when -- as president of AmeriPro, did you have some level of supervision or management over those -- those people?

A. I did.

Q. And how -- in what capacity of Mr. Nasserfar?

A. Mr. Nasserfar direct report -- reported to me.

Q. So you were his immediate supervisor?

A. I was Mr. Nasserfar's direct report's immediate supervisor.

Q. Who was his -- who was the immediate supervisor?

A. Larry Crisp.

Q.   The second -- you were the second in line?

A.   Yes, ma'am.

Q.   What about Mr. Task?

A.   Yes, same.

Q.   And Mr. Gosnay?

A.   Same.

Q.   So did you have general knowledge of what they for -- for AmeriPro, what they were supposed to be doing, that kind of thing?

A.   Yes.

Q.   What was Mr. Nasserfar's job title when he left AmeriPro?

A.   He was producing branch manager.

Q.   For what branch?

A.   For the Lakeway branch.

Q.   What about Mr. Task?

A.   He was the sales manager for the same branch.

Q.   And Mr. Gosnay?

A.   I believe he was a loan originator and loan services department, same branch.

Q.   And were there any other employees at that branch?

A.   Those were the only three employees at that location.

Q.   And is that -- where was that location?

A.   In the Hill Country Galleria.

Q.   And is that location still open and functioning as a

branch office of AmeriPro?

A. No, it is not.

Q. And why -- why not?

A. There is no business coming from that branch so currently it is empty.

Q. And when did that business go away?

A. Immediately after they resigned, end of January.

Q. So all clients, customers of that branch went basically to that -- the Nasserfar team?

MR. BUNDREN: Objection, leading.

Q. (BY MS. BURTON) Where did the business go that was coming to the Lakeway branch when Mr. Nasserfar, Mr. Task, and Mr. Gosnay were there?

A. Any business that was in the pipeline we transferred to the corporate office at AmeriPro and we -- they -- our business -- or new incoming business, I'm sorry, were -- weened off or slowed down very dramatically after that period of time.

Q. Any plans to reopen the AmeriPro branch office there in Lakeway?

A. No, there is not.

Q. And why was that branch -- when was that branch established?

A. The branch was established around the beginning of 2014.

Q. And why -- why did as you as president of Ameripo --

of AmeriPro decide to open that branch in Lakeway?

A. Mr. Nasserfar had worked for the company out of the corporate office for a couple years, had expressed a -- a willingness and wanted to become a branch manager and looked at that location specifically due to the future growth opportunity off the 71 corridor and 620 corridor, and it was close to where he currently resides and thought it would be a great business opportunity so he approached me specifically about opening a branch out there.

Q. And what was your response or your reaction?

A. I thought that the business opportunity made sense, it's a big growth corridor for the general Austin area, and we wanted to support Michael in his professional growth.

Q. And describe what type of time or effort AmeriPro put into opening that branch.

A. The lease negotiations took several months. During that time we put Mr. Nasserfar and Mr. Task in an executive suite in that same general vicinity and the lease negotiations were finalized and I believe the office -- that -- the new permanent office opened in August of 2014, so I would say from beginning to end the better part of 10 months to 12 months.

Q. It was 10 months to 12 months to get that branch office opened in Lakeway?

A. From the beginning of contract negotiation to when the new permanent location opened, yes.

Q. What other efforts did AmeriPro have to undergo to open that branch office?

A. We had to invest a tremendous amount of money in building out the branch office for tenant improvements. We had furnitures, fixtures, equipment, licensing requirements, everything that is required to get a new location started.

Q. And how involved was -- was Mr. Nasserfar with those activities?

A. He was involved as necessary for his position. We wanted him to remain focused on originating new loans. So he -- we kept him informed of what was going on during the process. He was informed of -- he was a part of the floor-plan decision, some of the furniture that we purchased or decided to reuse from a different office. So he was involved in the space and it's creation.

Q. Was there -- would you -- was there a general business plan for that branch or a model that -- you've talked about a little bit about why it was open, but was there some sort of plan or strategic goal?

A. Yeah. So Michael and his team had a significant amount of origination business that was a great stepping-off point to open up a location. We believed in the general geography around that office, that it would continue to allow them to grow. The plan was for him to go and recruit and add new originators to that location and to continue to grow as a

business from a -- a personal referral perspective and a builder perspective.

Q. And he was going to -- going to be and became the branch manager, correct?

A. Correct.

Q. And was he always an AmeriPro employee? Regardless of being a branch manager at a separate branch, was he an Ameripo -- AmeriPro employee?

A. Yes.

Q. Did that -- did that ever change?

A. No.

Q. What was the primary source -- what turned out to be the primary source of business for that branch?

A. The primary source of business for that branch was builder loans or -- they solicited builders and developers for -- to use them for their clients.

Q. And so it opened in August of 2014, correct?

A. Yes, the new -- the permanent location did, yes.

Q. And then Mr. Nasserfar and Task and Gosnay left in January 2015; is that right?

A. Correct.

Q. Was that branch -- was it successful? Was it looking like it was going to be successful?

A. We thought for the first year of opening a new location that it was doing well for its first year opening.

It's a -- it's a big -- it's a big effort to open a new location. It's a big financial investment from a long-term perspective and a short-term perspective, and we felt like it was going -- doing well in 2014 especially considering where the industry had gone.

Q. Do you know what the term "preferred lender" means?

A. Yes.

Q. And was -- what does that mean in general?

A. In general, builders or other corporate customers will have strategic partnerships with lenders and they will be called "preferred lenders" because of the level of trust and their operating system and how they do business.

Q. And was AmeriPro, specifically the -- Mr. Nasserfar's -- the branch Mr. Nasserfar ran, was that a preferred lender for any builders?

A. Yes, it was.

Q. Which builders?

A. Centerra Homes, Brohn Homes, Seaholm Condominium project, and I can't remember specifically, but there were others in the past, too.

Q. And again, the first -- is that a relationship that AmeriPro fostered, the -- the preferred lender relationship?

A. Yes.

Q. And in what way?

A. We met with the owners or operators of those

companies. Typically, we built a communication platform and a process around that. Michael was involved in that. It was a partnership for all parties that were involved, which would include Michael and his team and the corporate office and the operations team, to make those relationships successful.

Q. When you say "Michael," are you talking about Michael Nasserfar?

A. I'm sorry. Michael Nasserfar and Michael Task.

Q. And Michael Task?

A. Yes.

Q. Is AmeriPro still a preferred lender for any of those builders that you mentioned?

A. We are still on -- a preferred lender on the Web site with Seaholm, I believe, but not for Brohn Homes or Centerra.

Q. And is Oak Mortgage, to your knowledge, a preferred lender for Seaholm?

A. To my understanding they are now.

Q. And what about -- is Oak Mortgage a preferred lender for Centerra?

A. To my knowledge, they are, yes.

Q. And are they a preferred lender for Brohn?

A. To my knowledge, they are, yes.

Q. And prior to Mr. Nasserfar -- I'm going to call them the Nasserfar team. If I say that you'll understand that's Mr. Task, Mr. Gosnay, Mr. Nasserfar?

A. Yes.

Q. Prior to the Nasserfar team -- prior to the Nasserfar team leaving, was Oak Mortgage a preferred lender for any of those entities you named?

A. Not to my knowledge.

Q. Okay. Turn your attention to the resignation of the Nasserfar team and events that followed. So can you just describe to the Court, how did you find out that the Nasserfar team had resigned or was resigning?

A. I was in the HR office on January 15th and got notified that Mr. Gosnay -- we had received a package from Mr. Gosnay that contained his computer, his key, and a letter. Then correspondingly, the HR office reached out, I believe, to both Mr. Nasserfar and/or Mr. Task and so did their immediate supervisor, Larry Crisp.

Q. Okay. Would you look at Exhibit, in your notebook there, 2, 3, and 4. Are those the resignation letters of Mr. Nasserfar, Task, and Gosnay?

A. You said 2, 3 and 4?

Q. Yes.

A. Yes, they are.

Q. And let's start with Mr. Gosnay. What date is on his letter, which is Exhibit 4?

A. January 15th.

Q. And Mr. Task, what date did he resign?

A.   January 16th.

Q.   What date did Mr. Nasserfar resign?

A.   January 16th.

Q.   Did you personally reach out to any of those individuals?

A.   I called Mr. Nasserfar on the evening of the 15th.

Q.   And what -- did you get to talk to him or...

A.   I left a voice mail.  I also sent him a text right after that phone call.  I have not spoken to Mr. Nasserfar.

Q.   To your knowledge, did Mr. Nasserfar call anyone else back from AmeriPro?

A.   Not that I'm aware of.

Q.   How about Mr. Task or Mr. Gosnay?

A.   Not that I am aware of.

Q.   And why were you calling Mr. Nasserfar on the 15th of January?

A.   Because as of the evening of the 15th, his direct supervisor, Mr. Crisp, had not heard back from Mr. Task or Mr. Nasserfar and the HR department had not heard back from either of them.

Q.   So you --

A.   And we were wondering what was going on on the evening of the 15th.

Q.   Did you have any prior notice that the three of them were resigning and leaving that branch office?

A.    No.

Q.    You see in those letters, Exhibits 2, 3, and 4, they state they're returning certain things, correct?

A.    In 2 and 3 -- in 2 and 3.  4 does not --

Q.    That's right.  Mr. Gosnay --

A.    -- specifically say anything.

Q.    Sorry.  But 2 -- Exhibit 2 and 3 Mr. Nasserfar and Mr. Task listed certain items that they are returning, correct?

A.    Yes.

Q.    Are you aware that -- and that list just -- just to summarize, basically it's their laptop and their keys and their card -- access cards, that kind of thing?

A.    Yes.

Q.    Did they return anything else other than the items stated in those letters, Exhibit 2 and 3?

A.    Not that I am aware of.

Q.    Are you aware of them ever returning any hard copies, any paper copies of anything at the time of their resignation?

A.    No.

Q.    Did they ever return any property or any information prior to -- prior to AmeriPro filing the counterclaims against them?

A.    No.

Q.    Okay.  At the time they resigned, were there loans that they were all working on?

A. Yes.

Q. Were -- were each of these persons, Nasserfar, Task, and Gosnay, loan originators?

A. At the time I believe so, yes.

Q. And would that mean that they all had loans they were responsible for to work and to make sure got processed?

A. Yes.

Q. So when they left there were loans that were in existence that were still being processed?

A. Yes.

Q. Did they make any effort to transition those loans or make sure they were taken care of?

A. Not that I'm aware of.

Q. What -- how did this affect those loans in process? What did AmeriPro have to do after the resignation?

A. We tried to take the -- what we believe was the existing pipelines of loans in process, put it with loan originators at our corporate office, and reach out and contact those customers, more specifically the -- starting with the ones that had closing dates that were the soonest and working our way back.

Q. Describe what effect that had on the business of AmeriPro. What -- what effect did those resignations have?

A. We -- that -- because we did not have any assistance in the transition, the transition was difficult. You know,

trying to communicate with borrowers that amount of changeover in shift is always a -- a difficult time and our customer service level during that transition was not what I desired it to be because of that.

Q. Let me -- we're going to talk now about the various -- in a minute we're going to talk about the various employment agreements that these individuals signed at AmeriPro, but before we do that, I'm going to ask you after they resigned, after the Nasserfar team resigned, did AmeriPro take any action to try to remind them of their obligations?

A. Yes, I believe legal sent out a letter that reminded them of their contractual obligations.

Q. And would you look at Exhibit 6 and 7.

A. 6 and 7?

Q. Yes.

A. Okay.

Q. Do you recognize Exhibit 6?

A. It's a letter to Mr. Holden Thomas.

Q. Actually, let me start -- I'm sorry. Go back to Exhibit 5. Do you recognize Exhibit 5?

A. Yes. That's a letter to Mr. Nasserfar.

Q. Who's it from?

A. Ali Hedayatifar, general counsel, General Holdings.

Q. And what's the date?

A. January 19th.

regarding our legal rights.

MS. BURTON: Ask that Exhibit 6 be admitted.

MR. BUNDREN: No objection.

THE COURT: 6 will be admitted.

Q.  (BY MS. BURTON) So this -- as of January 20th, did you know whether or not the Nasserfar team was working for Oak Mortgage?

A.  I believe that's the day I found out, yes.

Q.  And how did you find out?

A.  I believe one of my employees came and told me that's where they had gone.

Q.  And prior to the Nasserfar team -- Nasserfar team working or Oak -- prior to the Nasserfar team going to Oak Mortgage, did Oak Mortgage have an Austin -- Austin office that you were aware of?

A.  I was not aware of an Austin office that they had.

Q.  And is Oak Mortgage a competitor of AmeriPro?

A.  Yes, it is.

Q.  And are they in the same business?

A.  Yes, they are.

Q.  What did you find out about the presence of an Oak Mortgage office in Austin after January 20th, 2015?

A.  I found out that Michael -- the Nasserfar team or the team as described earlier had moved to Oak Mortgage and that they were starting a branch location out in the same general

vicinity where our location was.

Q. And did you find out where that actual office was?

A. Later I did, yes.

Q. Where?

A. I believe at that point in time it was in the executive suites in the same complex as our office.

Q. So same complex as the AmeriPro Lakeway office?

A. Correct, yes.

Q. And how far away, do you have any idea?

A. I'd say it's probably a three-minute walk. It's in the same general Hill Country Galleria shopping area.

Q. Were you surprised about this -- these turn of events?

A. Yes, I was.

Q. Why?

A. I thought that we were moving successfully into the new year. We were looking forward to a great 2015. I did not know that Michael and his team had a plan to leave the company.

Q. Did Mr. Nasserfar, Mr. Task, and Mr. Gosnay sign various employment agreements while they -- while they worked at AmeriPro?

A. Yes, they did.

MS. BURTON: And, Your Honor, these are employment agreements that I'm going to go through hopefully relatively quickly that we did attach to the bench brief.

ask for admission of Exhibit 8.

(Applicant's Exhibit Number 8 offered.)

THE COURT:  Any objection?

MR. BUNDREN:  Which exhibit?

THE COURT:  8.

MS. BURTON:  It was not.  That's why I am asking for it to be admitted.

MR. BUNDREN:  Oh, okay.  I don't see any objection for this purpose.

THE COURT:  8 will be admitted.

Q.  (BY MS. BURTON)  Mr. Overhauser, when did Mr. Nasserfar start working for AmeriPro, what year?

A.  I believe it was 2011 or 2012.  I would need to refer to the agreements to be specific.

Q.  Go ahead.

A.  Oh.  2011.

Q.  So is it your understanding that as a condition of receiving access to AmeriPro's confidential information that Mr. Nasserfar had to sign that proprietary information agreement?

MR. BUNDREN:  Objection, leading.

A.  Yes.

Q.  (BY MS. BURTON)  And if you look at those employment agreements you referenced which -- why was he signing different employment agreements?

Q. No discussion about that at all?

A. Nope.

Q. Is it your testimony that AmeriPro does have confidential information?

A. Yes, it is.

Q. Describe what that is.

A. It would be our leads, prospects, loans in process, profit and loss, general ledger accounts, our vendors. It can contain forms and documents, processes. It contains the entirety of what we use to operate our business on a daily financial basis.

Q. Do you have any particular databases, AmeriPro -- does AmeriPro have databases in which it keeps confidential information?

A. Yes. We have our operating system which contains all of our borrower information, which would be confidential. We have our accounting system which contains all of our accounting data, vendors, payees, payors, et cetera. That would be confidential information.

Q. How are -- how are those databases protected by AmeriPro?

A. Every office location has a secure access physically and we've got -- you have to sign on to a network. Then you have another sign-on authentication into those respective systems.

Q. And was -- did Mr. Nasserfar have access to the -- what are the names of the databases?

A. Encompass is our operating system and Accounting for Mortgage Bankers or AMB is our accounting system.

Q. Did Mr. Nasserfar have access to Encompass?

A. Yes, he did.

Q. Did he have access to AMB?

A. Yes, he did.

Q. Did Mr. Task have access to Encompass?

A. Yes.

Q. What about AMB?

A. Not to my knowledge.

Q. Who has access to AMB?

A. Typically accounting -- our accounting system outside of corporate accounting department would be your executive level, so, for instance, myself, the head of sales, and then the branch manager at every branch location has access to accounting department --

Q. And as a branch manager, they have access to -- to what, just their branch?

A. They have access to all of the transactions for their cost center or their branch, yes.

Q. Did -- does the Encompass database also contain borrower information?

A. It does, yes.

Q. And how is that protected? Is that protected -- I'm sorry. How is that protected?

A. In the same manner. You have -- the physical location has security. You have to sign on to the network and then you have a separate username and password sign-on into Encompass.

Q. Let's turn back to the employment agreement for Mr. Nasserfar, Exhibit 11. Does it also contain a nonsolicitation provision?

A. Yes, it does.

Q. And that would be a nonsolicitation -- if you want to look at it, it's paragraph 5.

A. 5(e), I believe.

Q. And who does it prohibit solicitation of?

A. Customer, and 5(e)i, "customer, payor, or supplier," and then in 5(e)iii, "any Employee or consultant of the Company."

Q. And sticking with the nonsolicitive customer, how does -- as president of AmeriPro, how do you -- how does AmeriPro define "customer"?

A. Customer is anyone that does business with the company, the consumer themselves or anybody who's in a position to refer a potential customer.

Q. And who would be included in the referral sources?

A. Real estate agents, builders, CPAs, certified

financial planners, anybody that's in the industry that has an ability to refer business.

Q. And what -- is there anything that AmeriPro considers confidential when it comes to referral sources?

A. I'm sorry. Can you clarify?

Q. What kind of confidential information does AmeriPro keep or maintain about referral sources?

A. Oh. So you typically -- specifically as it relates to builders we keep a -- we have a process by which we handle their business and in some cases we have incentives for the clients, the consumers themselves.

Q. Explain that. What do you mean by "incentives"?

A. We will give a customer, i.e., what I mean by that is the end user who is securing a mortgage from us, a -- a lender credit or a financial benefit for the transaction.

Q. And how is that confidential?

A. Because it's something that we've agreed to do specifically for the referrals that come from a particular source.

Q. So, for instance, you might have a particular deal with Centerra Homes --

A. Uh-huh.

Q. -- and a different deal --

A. Yes.

Q. -- with Brohn Homes; is that correct?

A.   Correct.

Q.   And are you -- what do you -- you try to maintain the Centerra information confidential and not disclose it to other realtors?

A.   Typically, yes.

Q.   And you think -- is that something that you believe is standard in the industry?

A.   Yes.

Q.   Not -- I mean, the confidentiality is not -- it's not just AmeriPro, other mortgage companies would want that also?

A.   Correct.

Q.   What other type of information does AmeriPro compile as far as its relationships with referral sources that's considered confidential?  Do you have relationships with title companies?

A.   We do.

Q.   And what -- what's the --

A.   It would be considered, I would think, a customer list.  So on every transaction the originator is required to put in the referral source so that we understand where our business is coming from so that we can properly manage that business today and in the future.

Q.   Is that information about referral sources -- would that be valuable to a competitor?

A.   Yes, it would be.

Q.    Why?

A.    Because they would know exactly who we had received business from, the amount of business, the type of business that we had been receiving from them.

Q.    And is that information AmeriPro maintains somewhere?

A.    Yes, it's maintained in our operating system.

Q.    And that's Encompass?

A.    In Encompass, yes.

Q.    Which is protected and secure?

A.    Correct.

Q.    And if you look back at Exhibit 11, the provision -- is there a provision in there regarding ownership of leads and loans in process?

A.    Yes, in 5(f).

Q.    And what does that say?

A.    It says, "The Employee acknowledges that all leads and loans and process are company's property.  Employee agrees to provide upon termination a written account of any and all open leads, business prospects and/or loans in process as of the date of his or her termination and agrees not to take any action to divert such loans to a competitor or away from the Company."

Q.    Did Mr. Nasserfar comply with that provision?

A.    No, he did not.

Q.    And Mr. Task?

Q. Well, to your knowledge, has he ever requested that from you?

A. No.

Q. Or anyone else at AmeriPro that you know of?

A. Not to my knowledge, no.

Q. Was his employment in good standing at the time he left AmeriPro?

A. No, it was not.

Q. Why not?

A. Because he did not per his agreement turn over a list of leads or prospects or loans in process and he did not assist in helping them close, which I believe is defined in section 5(e) also or section 5(f) more specifically.

Q. And I'll say one more thing on the employment agreement, Exhibit 11. Is it -- what does -- what does it say about returning AmeriPro's confidential information?

A. Sorry. I need to read it. Are you referring to --

Q. Section 5.

A. -- 5(f) specifically or 5(h) that says, "The Employee agrees upon the termination of his employment that he or she will immediately refrain from and discontinue making any representation of his employment with the Company"?

Q. I'm asking you about what is -- what was Mr. Nasserfar's obligation about returning confidential information?

A. He needed to return it immediately.

Q. And did -- did he do so?

A. No.

Q. And then we've talked about Mr. Nasserfar's employment agreements. If you'll look at 13, 14, 15, 16, and 17, those are all Mr. Task's employment agreements.

MS. BURTON: They're all -- they're all already admitted, correct?

THE COURT: (Nods head affirmatively.)

Q. (BY MS. BURTON) So those are all Mr. Task's employment agreements, correct, Mr. Overhauser?

A. Yes.

Q. And would those contain the same or similar provisions as Mr. Nasserfar that we discussed earlier?

A. Yes, they would.

Q. What was Mr. Task's last position at AmeriPro before he resigned? I think that's 17.

A. Sales manager.

Q. At the AmeriPro Lakeway office?

A. Correct.

Q. And like Mr. Nasserfar, was he -- did he sign a new employment agreement every time he got a new position?

A. Yes.

Q. And if you look at Exhibit 14, can you identify that, please?

A. Exhibit 14 is a proprietary information agreement.

Q. And was it signed by Mr. Task?

A. Yes, it was.

Q. And what's the date on that?

A. March 11, 2011.

Q. And like Mr. Nasserfar, would he be required to sign that before he was given access to confidential information?

A. Yes.

Q. And was that one -- one of the many ways AmeriPro tried to protect its confidential information?

A. Yes.

Q. Are you aware of Mr. Task returning any documents, either paper or electronic, after he resigned and before this litigation?

A. No.

Q. If you look at 18 and 19, which have also been admitted, just -- are those Mr. Gosnay's employment agreements?

A. Yes.

Q. And was he -- what was Mr. Gosnay's title?

A. Loan officer.

Q. And when was he first employed?

A. May of 2014, it appears.

Q. And then if you'll look at Exhibit 20, can you identify that?

A. Confidential information and company property.

Q. And was that signed by Mr. Gosnay?

A. Yes, it was.

Q. Does that document contain a definition of "confidential information"?

A. Yes, it does.

Q. And does it also require Mr. Gosnay to return that information upon termination?

A. Yes, it does.

Q. And what does it say about whether he can keep any copies?

A. It says you cannot retain any copies.

Q. And you -- are you aware of Mr. Gosnay returning anything at the time he resigned, any paper documents, electronic files, anything like that?

A. No, I am not.

Q. We talked earlier about the provision regarding them -- the employees who leave providing AmeriPro with a list of loans in process. Do you recall that?

A. Yes.

Q. What's the reason -- why does AmeriPro require that in their agreements?

A. One of the reasons that we require it is to make a smooth transition for the current customers in the company's pipeline.

Q. Isn't it true that some of that -- that the

information would be in AmeriPro's computer database?

A. If a loan -- if the customer had made application with the company, it would be in the company's operating system, yes.

Q. So what would AmeriPro need in order to have a smooth transition?

A. We would need not only the information that is contained in the operating system but any conversations that may have happened with that customer that would not be contained in the operating system.

Q. So who would have knowledge of that?

A. The loan officer of -- that is on that particular file, the salesperson.

Q. And did you get -- get any of that information from the Nasserfar team, anything about conversations?

A. No.

Q. Did you get anything about the loans in process?

A. Not to my knowledge.

Q. Are you aware that Mr. Nasserfar and Mr. Task and Mr. Gosnay claim they're owed commission under that section, section 5(g)?

A. I am aware of that, yes.

Q. And why hasn't AmeriPro paid them their commissions?

A. Because they did not leave in good standing.

Q. And is that -- that what the agreement says, that

they have to be in good standing?

A. Correct.

Q. And why weren't they in good standing?

A. Because they did not turn over a list of leads, prospects, loans in process, or assist in the closing of those loans.

Q. In this litigation you're aware AmeriPro's made certain claims against Oak Mortgage and the Nasserfar team, correct?

A. Yes.

Q. What is basically the basis of the claims against Oak and those individuals?

A. The basis of the claim is that our information -- our confidential information was stolen. It was taken from us and used to compete directly against us in a new location in -- in the direct vicinity of our existing Lakeway office.

Q. What type of information have you learned that Nasserfar and -- the Nasserfar team took and --

A. To date --

Q. Yes.

A. -- I'm aware of, again, profit and loss statements for the branch location, detailed general ledger accounts for the branch location, funded list -- funded loan reports which contain the revenue and expenses associated to the loans alongside of other confidential information, a copy of the

company's master lease for the Lakeway location, a copy of the benefits division employee paid/company paid for health insurance and dental and life insurance benefits that the company has, and then more specifically, a general list of all the loans closed by the branch and what type of loan they were.

Q. And how have you learned that that information was taken?

A. Through the process of discovery.

Q. And would that type of information give a competitor a competitive advantage?

A. Yes, it would.

Q. And why?

A. Because in the establishment of a new location they would know exactly how much volume would be coming. They'd know how many loans are coming. They'd know what type of loans. They'd know what the average revenue to expect on a loan was, what the average expenses for a loan are and they'd know the expenses of the branch, i.e., telecom, copier. They would just know exactly what does it take to run the branch and have an expectation of how much revenue and volume is coming into the branch. They'd have a head start in starting a new location.

Q. Is that information that you had ever authorized Mr. Nasserfar or Mr. Task or Mr. Gosnay to give to anyone outside of AmeriPro?

A.    No, it's not.

Q.    Okay.  We've talked a little bit about the steps Americo take -- AmeriPro takes to protect its confidential information and you just talked about the -- the databases being password protected.  What else does AmeriPro do?

A.    So we have -- again, physical locations are secured. We have a sign-on process to get into the domain or the -- the company's computer system, and then you have another authentication process, username and password, to get into both the loan origination system, Encompass and into the accounting system, the Accounting for Mortgage Bankers or AMB.

Q.    Do you have an employee handbook?

A.    Yes, we do.

Q.    Look at Exhibit 21.  Is that a correct copy -- a current copy of the AmeriPro employee handbook?

A.    It appears so, yes.

Q.    What's the date on it?  If there is a date.

A.    There's no date on this.

Q.    If you look at the bottom of the page -- look right -- it says, "Revised."

A.    It says -- where is it?  "Revised February" -- sorry. It was on the next page.  "Revised February 1, 2014."

Q.    Okay.  Does this handbook contain a policy on confidential information?

A.    I believe it does, yes.

Q. Page 56?

A. Of Exhibit 21?

Q. Yes.

A. I'm sorry. You're referring to the actual page or the marker on the bottom right-hand corner?

Q. The actual page.

A. Okay.

Q. What is -- what's the policy called?

A. Confidential information and company property.

Q. Does that contain a definition of "confidential information"?

A. Yes, it does.

Q. Would that, based on your understanding, be generally accurate?

A. Generally, yes, it would be.

Q. And is it your understanding that Mr. Task and Mr. Nasserfar and Mr. Gosnay all received a copy of this handbook?

A. Yes.

Q. If you'll look at -- I think 21 is the handbook. Look at Exhibit 22.

MS. BURTON: Mr. Bundren, can we stipulate they received a copy of the handbook, Exhibits 22 and 23 and 24?

MR. BUNDREN: 21 was already produced.

MS. BURTON: Yeah. 22 and 23.

MR. BUNDREN: For purposes of this hearing, I don't have any objection.

THE COURT: Okay.

(Applicant's Exhibit Numbers 22, 23 offered.)

MS. BURTON: Move for admission of AmeriPro Exhibits 22 and 23.

THE COURT: 22 and 23 will be admitted.

Q. (BY MS. BURTON) All right. Mr. Overhauser, if you'll look at Exhibit 25, please. Do you have that in front of you?

A. I do.

Q. Can you identify that?

A. It appears to be text messages.

Q. Between who?

A. Jason, Michael, and Michael.

Q. Michael -- and this is a deposition exhibit for Mr. Nasserfar -- "Michael" and "Michael" being Task and Nasserfar?

A. I assume so, yes.

Q. If you look at the bottom of that page, do you see that screen shot of a document?

A. Yes.

Q. Well, first of all, can you see what -- what -- let me start that over.

If you look at that screen shot, what does that

appear to be?

A. A text message.

Q. And what's the screen shot? What's the document?

A. In the bottom right-hand -- bottom corner it is a -- it looks like a picture of a pipeline.

Q. What do you mean?

A. Closing report.

Q. Okay. Say -- explain what that is.

A. Michael kept an Excel document that had all of his projected closings with notes and statuses.

Q. So who does the document belong to?

A. The company.

Q. AmeriPro?

A. Correct.

Q. So what is this showing?

A. It's showing company information regarding its customers.

Q. All right. So are there customer/borrower names on there?

A. Yes.

Q. And is that confidential information?

A. It is.

Q. Is that something that's publicly available at this point in time?

A. No, it's not.

Q. I mean, at the time this document is created?

A. No, it's not.

Q. Can you tell who that -- who is that document being given to?

A. I assume it's someone named Jason.

Q. Okay. But you don't know who that is?

A. I do not.

Q. Okay. If that was being given to a competitor, would that be in violation of Mr. Nasserfar's duties to AmeriPro?

A. Yes, it would be.

Q. Why are borrower names confidential?

A. Because borrowers' information is protected by several rules or regulations in our industry.

Q. And that's something you-all maintain?

A. Correct.

Q. If you look at Exhibit 26, you go to the spreadsheet that's included in that Exhibit, do you see that?

A. Correct.

Q. Does that appear to be the -- is that an internal AmeriPro document?

A. Yes, it is.

Q. And what is it?

A. It's a pipeline report.

Q. Does it appear to be the same pipeline report you just looked at in the text message?

part of that exhibit.

THE COURT: All right. 25 and 26 will be withdrawn.

Q. (BY MS. BURTON) So, Mr. Overhauser, I refer you to Exhibit 27.

A. I'm there.

Q. Okay. In November of 20 -- in November of 2014, was Mr. Task still employed by AmeriPro?

A. Yes, he was.

Q. And if you're -- you were -- do you recall seeing this document before, Exhibit 27?

A. I do.

Q. Okay. And it's an e-mail, correct, from Jackson Thomas at Oak Mortgage to Michael Task?

A. Yes.

Q. And if you look and see what Mr. Thomas is asking Mr. Task to give him, is there anything in there that's AmeriPro's confidential information?

A. Yes, there is.

Q. What?

A. The year-to-date profit and last year's profit and loss, product mix, staff members, more specifically their compensation, pricing information would all be confidential information of the company.

Q. So Mr. Task, did he have any authority to give that

to Oak Mortgage?

A. No, he did not.

Q. Would that be in violation of the agreements he signed with AmeriPro?

A. Yes, it would.

Q. Does AmeriPro -- we talked about how AmeriPro maintains confidential information. Do they go -- does AmeriPro go to some expense to compile and maintain it?

A. Yes, absolutely we do.

Q. I mean, the databases you talked about?

A. Yeah. We -- we host our databases at both onsite and offsite locations. We have a multiple authentication process. We have a separate IT department. We have backup processes and procedures. So, yes, we go to lengths to maintain that information securely.

Q. I could go to Google and I could look up builders, correct?

A. Correct.

Q. So how does AmeriPro claim that its builder referral sources are confidential?

A. Because it's not publicly available.

Q. What's not publicly available?

A. The information in how we do business with a particular client as -- as a builder.

Q. You're not claiming the name of the builder's

confidential, correct?

A.   No, I'm not.

Q.   You're claiming the relationship or -- or the information relating to that referral source?

A.   Correct.

Q.   If Mr. Task gave Oak Mortgage what Mr. Thomas was asking for in this e-mail, which is Exhibit 27, would that give Oak a competitive advantage?

A.   Yes, it would.

Q.   Just pick one or two things, why would that give him a competitive advantage?

A.   From a pricing perspective they would understand how our pricing compares to theirs in specific scenarios.  If we were -- if that information was to be given to them, they would understand the cost of our location.  Inside of the profit and loss statements they'd understand what does the cost of this location take -- what does it take to operate this location on a daily or monthly perspective.  Product mix would also be part of a combination with profit and loss, understanding the revenue streams of the company and, more specifically, revenue streams by product.

Q.   Is that information AmeriPro had taken time to develop and maintain?

A.   Yes.

Q.   Look at Exhibit 28.  Do you recognize that?

A. Yes, I do.

Q. What is that?

A. It is a general ledger account of branch 152180.

Q. Which is which branch?

A. It is the Lakeway location, the one that Michael ran.

Q. What's the date range?

A. From January 1st, 2014, through January 31st, 2014.

Q. And what is this used for by AmeriPro?

A. This is the detailed information that makes up the profit and loss statement.

Q. Is this confidential?

A. Yes, it is.

Q. And would this if given to a competitor give them an advantage?

A. Yes, it would.

Q. What does it show them?

A. It shows them the revenue and -- and expenses at a location in a specific format.

Q. And how did AmeriPro maintain the general ledger, how -- how is it protected?

A. Again, it is behind a multiple authentication process. So it's behind a secure physical door for the office, a secure login to the network, and another secure username and password login into the actual accounting system.

Q. Okay. Look at Exhibit 29. What is that?

A. Statement of income.

Q. For?

A. Branch location 152180 or Michael Nasserfar's branch location.

Q. What's the date range?

A. It says, "For period ending November 30th, 2014."

Q. And again, it's something that AmeriPro maintains is confidential?

A. Yes.

Q. And would there be any reason -- any legitimate reason why a AmeriPro employee would give this to a competitor?

A. No.

Q. And then if you look at Exhibit 30, what is that?

A. That's the funded loan report for, again, branch 152180.

Q. Time frame?

A. January 1st, 2014, through December 31st, 2014.

Q. And you say that these exhibits I've been referencing that there's a -- you know, the Bates -- you know what a Bates label is, right, the Oak Mortgage reference?

A. Yes. I'm sorry.

Q. So is it your understanding these were produced in discovery by Oak Mortgage?

A. Yes.

Q. Okay. Any reason -- any legitimate reason why Oak

Mortgage should have these exhibits like Exhibit 30?

A. No.

Q. What is on the funded loan report, Exhibit 30, that's confidential?

A. Borrower's name, the loan amount, all the revenue associated to the specific loan, and some of the expenses specifically related to it, coming up with a total loan/income number on the far right. None of that is publicly available.

Q. All right. Let's go over to Exhibit 36. Do you recognize that?

A. Yes, I do.

Q. What is that?

A. It's a letter -- it's an e-mail from Ty e-mailing to what appears to be his personal Gmail account with an attachment.

Q. What's the date?

A. January 13th, 2015.

Q. And what day did he resign?

A. January 15th --

Q. And this --

A. -- 2015.

Q. -- is Ty -- Ty Gosnay, correct?

A. Correct.

Q. What is his attachment to Exhibit 35, what is that?

A. Attachment to Exhibit 35?

Q. Yeah, what you're -- the exhibit you're looking at.

A. It says, "Community fees."

Q. So what is that spreadsheet?

A. And then the next page has communities for three builders and it outlines tax rates, HOA fees, and other information specifically to that community. In addition, it also has contact information for each one of those communities.

Q. So builder contact information?

A. Yes, that's what it appears to be.

Q. And is this an AmeriPro internal document?

A. Yes, I believe so.

Q. Is it something AmeriPro maintains is confidential?

A. Yes.

Q. And why is it confidential to AmeriPro?

A. Because we aggregated this information on our time and effort.

Q. Mr. Gosnay have -- did he have any authority to convey that to a competitor?

A. No, he did not.

THE COURT: Is this a good place to break for lunch?

MS. BURTON: I probably can finish in --

THE COURT: Go ahead.

MS. BURTON: -- by 12, 15 minutes, maybe 10, if you want me to?

or --

MS. BURTON: No. I just want to ask him about them and then submit redacted --

THE COURT: 36 and 37?

MS. BURTON: Yes.

THE COURT: They've already been admitted.

MS. BURTON: Okay. You're right.

THE COURT: So you can ask him about them.

MS. BURTON: Okay. Thanks. Sorry.

Q. (BY MS. BURTON) So, Mr. Overhauser, Exhibit 36 and 37, would you look at those.

A. Okay.

Q. What are those?

A. 30 --

Q. Let's start with 36. What is 36?

A. 36 appears to be an e-mail from Ty Gosnay to himself with the attachment -- it says, "Mortgage letter Michael Nasserfar AmeriPro Funding doc -- ameriprofunding.doc."

Q. And what's the date?

A. January 13th, 2015.

Q. Okay. Look at the attachment, the actual letter, and can you identify that?

A. Yes, that is our prequalification letter.

Q. AmeriPro's?

A. Correct.

Q. All right. And if you look at Exhibit 37, look at that letter.

A. Correct.

Q. What does that appear to be?

A. It appears to be a letter in the same format, different applicant.

Q. Well, whose -- whose letter -- whose letterhead's on that?

A. Oak Mortgage.

Q. Comparing 36 to 37, what does it appear to you as far as these letters?

A. Appears to be the same letter with a different -- a different company on the top and different borrower -- a different applicant.

Q. Was this, Exhibit 36, an AmeriPro form?

A. Yes.

Q. And did Mr. Nasserfar use it when he worked at AmeriPro?

A. Yes, I believe so.

Q. And what is 37?

A. It's the same form at Oak Mortgage.

Q. And what's the address at the bottom of each of those letters, or is it the same address?

A. The address is the same at the bottom of both letters.

Q. Is that an Oak Mortgage address or AmeriPro address?

A. I believe that was -- I believe that was our address, but I would need to look at leases to confirm.

Q. Meaning that the address was not changed from the --

A. Correct.

Q. -- AmeriPro letter to the Oak Mortgage letter?

A. Correct.

Q. Okay. Is this a -- Exhibit 36, the AmeriPro letter, was that something that was publicly available?

A. No, it would not be --

Q. How would --

A. -- not this specific letter.

Q. -- AmeriPro be harmed by using -- if -- if they're -- if Nasserfar's team contention is these are just forms, we can find them publicly, what's your response to that as far as how it harms AmeriPro?

A. If any form is adapted or changed for use at the company, then it becomes the company's confidential information.

Q. And how -- and how -- you said AmeriPro has been in business how long?

A. A little over 12 years.

Q. And over that time has AmeriPro developed forms?

A. Yes.

Q. And what else has it developed?

A.    Forms, other documents related to the loan process, communication templates that would go to borrowers or real estate partners or other referral sources.

Q.    And if a competitor was given access to that type of information, how it would it help them?

A.    It just would accelerate the time for setting up a new location.

Q.    Okay.  And just turn to the nonsolicitation provision in the employment agreement and the contentions that have been made in this case.

A.    Okay.

Q.    I'm going to focus you specifically on Centerra Homes.  What is your understanding of how Centerra Homes began -- became to be a customer at AmeriPro?

A.    Michael introduced me to Tom Grant, who is the current owner or CEO of Centerra Homes.

Q.    And at that time, did Mr. Nasserfar tell you that Mr. Grant was a prior customer of his?

A.    No, he did not.

Q.    What did he tell you about his relationship with Mr. Grant?

A.    That he had met Mr. Grant, I believe, when they had worked -- when he worked at a -- a different company -- when Michael had worked at a different company.

Q.    Did he say Mr. Grant was a customer of his at the

different company?

A.    No.

Q.    Just that he had a relationship?

A.    Correct.

Q.    So was it -- how did it come about that -- well, when Mr. -- when you met Mr. Grant was he then president of Centerra Homes?

A.    I believe so, yes.

Q.    And how did Centerra Homes -- Michael made the introduction, correct?

A.    Michael made the introduction.

Q.    And how did Centerra become a customer of AmeriPro?

A.    Over the course of the following months both Michael, myself solicited Mr. Grant for him to bring his business to AmeriPro Funding from Centerra Homes.

Q.    So did AmeriPro expend time, energy, and effort to do that?

A.    Yes.

Q.    When Mr. Nasserfar was soliciting Mr. Grant that time, was he an employee of AmeriPro?

A.    Yes, he was.

Q.    Was -- what about Brohn Homes, how did they come to be a customer of AmeriPro?

A.    That one I believe Michael went out specifically, solicited them and earned their business during his employment

with the company.

Q.   With AmeriPro?

A.   Correct.

Q.   And did you have any -- did he ever tell you that they were a customer of his before he came to AmeriPro?

A.   No.

Q.   Do you have knowledge as to when Centerra Homes was actually formed or began as a business?

A.   I do not.

Q.   All right.  Let me ask you -- kind of summarize your testimony.  Can you summarize to the Court the harm that AmeriPro has suffered due to the actions of Oak Mortgage and Mr. Task and Mr. Nasserfar and Mr. Gosnay?

A.   Sure.  Our information was taken from us, our confidential information.  I believe that it was used specifically to open up a new location in direct competition with us in our vicinity.  Since then, we have lost a tremendous amount of business from customers and clients for which we were doing business before, and in addition to that, we have a location that's no longer operating that we have an expense associated to.

Q.   And have you been able to calculate with any certainty the damages that AmeriPro has suffered?

A.   I cannot specifically calculate that now.  I believe they're ongoing as we continue to discover new information.

Q. There's one customer I forgot to ask you about, Seaholm. Is that -- that's the condo project, correct?

A. Yes.

Q. Were they a customer of Mr. Nasserfar's prior to him coming to AmeriPro?

A. No, not that I know of.

Q. Was -- do you know when Seaholm was -- was founded?

A. I believe the project started at some point in the last couple of years and we were given an opportunity to become a preferred lender. Specifically Michael Task was working on that project.

Q. And that was while he was employed by AmeriPro?

A. Yes, it was.

Q. And do you have any knowledge of whether Mr. Task had a prior customer relationship with Seaholm before he -- well, he couldn't have because he -- did he have a prior customer relationship with Seaholm before he gan work -- began working for AmeriPro?

A. I don't believe so because the project started after his employment with the company.

Q. So while at AmeriPro is when AmeriPro became a preferred lender for Seaholm?

A. Correct.

MR. BUNDREN: Objection, leading.

THE COURT: Sustained.

THE WITNESS: I'm sorry. Should I have waited?

Q. (BY MS. BURTON) Anything else, Mr. Overhauser, you want to add about the damage or -- damages or harms suffered by AmeriPro in this case?

A. I would just say that they're -- they're ongoing as we continue to -- I mean, even the information we've just -- that's come to light in discovery was new information for us and that is significant and material to the company. Not only have we lost the opportunity for business, but we have also have a location that is no longer producing revenue that is just an expense that was specifically executed to have Michael -- Mr. Nasserfar run it with his team.

MS. BURTON: Thank you. Pass the witness.

THE COURT: I think this is a good time to break for lunch. You may step down. We'll start back up at 1:30. You-all are excused.

(Break taken from 11:56 a.m. to 1:43 p.m.)

THE COURT: Okay. You want to come on back?

(Witness takes the stand.)

MS. BURTON: Your Honor, I have one thing to do. I didn't offer an exhibit. I already --

THE COURT: Okay.

MS. BURTON: -- talked with Mr. Bundren. He said there was no objection. The -- Applicant's Exhibit 7.

MR. BUNDREN: No objection.

A.  If that information was on that sheet they could.

Q.  And you can't testify that it wasn't -- or it wasn't there, can you?

A.  I didn't personally review the computer.  I can testify to what was shown to me this morning.

Q.  But you can't say based upon your -- you can't say under oath that that spreadsheet was not on his computer when you got his computer, can you?

A.  I could not speak to that specifically, no.

MR. BUNDREN:  Pass the witness.

THE COURT:  Anything else, Ms. Burton?

REDIRECT-EXAMINATION

BY MS. BURTON:

Q.  Mr. Overhauser, you were asked some questions about whether AmeriPro had written agreements with builders and realtors and referral sources and you said no; is that correct?

A.  Yeah.  I wanted to be very specific.  We have some written agreements for rent with certain real estate agents or a marketing function with certain real estate agents.  We do not have any with builders at this point.

Q.  Do you have agreements with builders that are not in writing?

A.  I need you to be a little bit more specific.  I'm sorry.

Q.  Well, do you have understandings about lender credits

and things like that?

A. Yes.

Q. Okay. But they're not in writing?

A. That is correct.

Q. But it -- is it your testimony that is an agreement that you have?

A. Yeah. We have an agreement specifically with builders on what we will give to their customers.

Q. Is that something that you make public to your competitors?

A. No.

Q. Is that something that you make publicly available -- do you make that publicly available?

A. Not to my knowledge.

Q. Is that something that AmeriPro uses in order to gain a competitive advantage?

A. Yes.

Q. You were also asked some questions about borrower information. Is there a law, a regulation that protects borrower information?

A. Yeah, Regulation P and Gramm-Leach-Bliley protect the consumer's information.

Q. All right. And just -- for instance, Mr. Bundren's questions were, Well, the title company has borrower information. How does the title company get that information?

A. They get it from us.

Q. And how does -- how -- how is it that you are able to give that to them?

A. We're required to to do the transaction.

Q. And does the borrower agree that you can give them that -- that information?

A. Correct.

Q. All right. So if a borrower -- in a typical scenario if I'm borrowing money for a house, of course the lender and the title company has to have certain information, correct?

A. Correct.

Q. If a borrower -- do you have any knowledge of the borrower -- AmeriPro borrow -- borrowers consenting to Mr. Nasserfar or Mr. Task downloading their information on a thumb drive?

A. No, I do not.

Q. And do borrowers typically consent to have their credit applications taken by ex-employees of AmeriPro?

A. No, not typically.

Q. Would that be a violation of the federal law?

A. Yes, it would be.

Q. All right. And what's the purposes of that regulation to your -- to your understanding as far as protecting borrower information?

A. The purpose is to protect the consumer's confidential

data.

Q.    Do you have any knowledge of any Ameripo -- AmeriPro borrower consenting to Mr. Task taking hard copies of documents with borrower information on them?

A.    I do not.

Q.    Are you aware that he returned to us in this litigation a box of documents that contained borrower information?

MR. BUNDREN:  Objection, leading.

THE COURT:  Sustained.

THE WITNESS:  So do I answer or not?

THE COURT:  No.

THE WITNESS:  Okay.

Q.    (BY MS. BURTON)  Are you -- do you have any knowledge of Mr. Task returning any paper copies of documents?

A.    Yes.

Q.    And what is your knowledge?

A.    That he returned a box of information that contained, I believe it was, financial statements and other documents.

Q.    Was this information that he would have gotten because he was an employee of AmeriPro?

A.    Correct.

(*Sotto voce* discussion.)

Q.    (BY MS. BURTON)  I think we talked earlier in your direct testimony about the steps AmeriPro takes to protect

Q.   You're currently the Austin area sales manager for Oak Mortgage, correct?

A.   Correct.

Q.   You resigned from AmeriPro on Friday, January 16, 2015, correct?

A.   Correct.

Q.   Up until the day you resigned, January 16th, you never told anyone at AmeriPro that you were leaving; is that correct?

A.   Correct.

Q.   The following Monday, January 19th, Oak Mortgage opened a new Austin office with you as one of its employees, correct?

A.   Correct.

Q.   Ever since you resigned from AmeriPro, you've kept copies of AmeriPro's confidential financial records, correct?

A.   I was told not to destroy anything, correct.

Q.   Different question:  I didn't ask you if you were asked to destroy or not.  You took, with you, copies of AmeriPro's confidential financial records, correct?

A.   A copy of records, correct.

Q.   You took them home in a box, correct?

A.   Correct.  I had hard copies and electronic copies, correct.

Q.   You've known the entire time since you resigned from

AmeriPro that you still had copies of its confidential records, correct?

A. I don't know if it was confidential, but I did give the information to my counsel.

Q. Have you ever testified that they are confidential records?

A. I may have in my deposition, but I don't know if that's accurate because I'm not an attorney to determine that.

Q. If you turn to Page 19 of that deposition transcript that I gave you.

Line 15, question: "You --

A. What page are you saying? I'm sorry.

Q. Page 19, Line 15.

A. Got it. Yes, sir.

Q. I asked you the question: "You've kept copies of AmeriPro financial records that are confidential. They're not public. Ever since you resigned from AmeriPro, correct?"

Answer: "That's correct."

Question: "And you knew you still had those AmeriPro financial records, those confidential records, ever since you've resigned, correct? It's not something you just forgot you had?"

Answer: "No, I had not forgotten."

Question: "You knew the entire time since you've left AmeriPro that you have had them, correct?"

Answer: "That's right."

Did I read that correctly?

A. Yes, sir.

Q. You didn't ask anyone's permission at AmeriPro to take this information home with you, did you?

A. I did not.

Q. You didn't even tell AmeriPro that you had taken its confidential records, did you?

A. Again, I don't know if their definition of confidential is accurate, but I did not tell anybody.

Q. Well, if you would turn to tab 28 in the exhibit notebooks.

(*Sotto voce* discussion.)

MR. BUNDREN: Are you asking -- is that Exhibit 28?

MR. BEHRENS: Yes.

Q. (BY MR. BEHRENS) Are you there?

A. Yes.

Q. Okay. Exhibit 28 are AmeriPro's monthly general ledgers for the Lakeway branch where you worked, correct?

A. Correct.

Q. They're the ledgers for every month in 2014, correct?

A. Is the entire month behind your -- I assume you're -- looks to be correct.

Q. The day before -- the day before you resigned from

AmeriPro, you filled a bankers box with these monthly general ledgers and several other AmeriPro financial records to take with you, correct?

A. I made copies.

Q. You even took personnel records of other AmeriPro employees including how much salary they make, correct?

A. I'm unaware if I did, but it's possible.

Q. In the last few weeks you returned a bankers box of exhibits -- documents that you had at your house, right?

A. Correct.

Q. And one of those folders that you had in there is the salary of Julie Ann Curby, of Ms. Strange, their employment agreements; you took their personnel records home with you, didn't you?

A. I had copies, correct.

Q. And you had copies of personnel records of other employees of AmeriPro at your house even after you resigned from the company, correct?

A. I had copies of records.

Q. And you took those records -- you loaded the bankers box with those records the day before you resigned, correct?

A. I don't know if it was the day before but correct.

Q. When you resigned from AmeriPro, you knew that you had contract provisions that required you to return all property of AmeriPro including confidential information,

correct?

A. I knew from the letter that counsel sent me on January 20th reminding me.

Q. My question was different: You were aware that you had contract provisions that required you to return all property of AmeriPro including confidential information upon your termination, correct?

A. I'd have to look at the contract at this moment. But at the time, I don't know if I knew it verbatim or knew word for word what it said.

Q. Please turn to Page 141 of your deposition transcript.

A. Okay. 141?

Q. Yes.

A. Okay.

Q. Line 11.

Question: "You're aware that you had contract provisions that required you to return all property of AmeriPro including its confidential information upon termination, correct?"

You asked, "Upon termination or resignation?"

My question: "Termination of your employment voluntary or not?"

And your answer was, "Yes."

Did I read that correctly?

A. Yes.

Q. Question: "You had a requirement to return all such information, correct?"

Answer: "I have -- I understand that."

Question: "You gave your resignation through Federal Express on the 15th for delivery on the 16th, correct?"

Answer: "That's correct."

Question: "And after that, you did not return the information, you took it home, correct?"

Answer: "I did take it home."

Did I read that correctly?

A. You did.

Q. You chose not to comply with your contract provisions with AmeriPro and took its financial information and borrower list to your house instead, correct?

A. I made copies.

MR. BUNDREN: I'm going to object. That's a multiple question, Your Honor. Multiple questions, just break it down and be fine.

MR. BEHRENS: I asked the same question in deposition, he said, "Yes."

THE COURT: If you will break it down, that will be fine.

MR. BEHRENS: You bet.

Q. (BY MR. BEHRENS) You chose not to comply with your

contract provision with AmeriPro, correct?

A. I don't know if I necessarily made a conscience decision to choose not to.

Q. If you turn to page 142 of your transcript.

Are you there?

A. I am.

Q. Line 8:

"And you knew you had it and chose not to return it, correct?"

Answer: "Once I was asked, I returned it through counsel and here it is."

Did I read that correctly?

A. You did.

Q. You did choose not to return information that you knew you had in your possession, correct?

A. Again, once I was asked, I returned it.

Q. Not to AmeriPro. You gave it to your attorney, correct?

A. Correct.

Q. Now, both you and Mr. Nasserfar intentionally took list of AmeriPro borrowers including their loan numbers and other financial information with you when you resigned from AmeriPro, correct?

A. Correct.

Q. Under federal regulations, you understood that

nonpublic personal information of consumers includes any list or grouping of consumer names that was derived from AmeriPro computers, correct?

A. I did not know that. I think that Reg P was initiated, enacted in June of 2014. So it's a fairly new statute and legislation.

Q. Could you turn to page 70 of your transcript? Are you there?

A. I am.

Q. Line 20:

Question: "Under federal regulations, you understand that nonpublic personal information includes any list or grouping of consumer's names derived from AmeriPro computers, correct?"

Answer: "That's my understanding."

Did I read that correctly?

A. Yes. Prior to that question, you had spoke about numerous occasions and that was my understanding at that point.

Q. Well, you're licensed, aren't you?

A. I am licensed, yes, sir.

Q. And one of the things that you had to take a test on was Regulation P and its requirements, correct?

A. No, sir.

Q. If I look on the website and see that Regulation P is one of the things listed as a test exam topic, your memory is

make sure those records were preserved, that nothing happened or they weren't destroyed at AmeriPro; is that correct?

A. That was correct.

Q. In your pleadings to this court you made exactly the opposite representation, didn't you? You represented to the Court first, "Nasserfar, Task, or Gosnay did not have confidential information or trade secrets of defendant when they left the employment of defendant." Do you see that?

A. I see that, yes.

Q. So instead of telling the Court, "Yes, Your Honor, I did take confidential information, but it's to protect myself in case of litigation." You told the Court, "Your Honor, I don't have anything at all," didn't you? That's what you say here.

A. Well, again, I think the language of confidential information was in dispute and I'm still not -- again, I'm not an attorney. So the legal piece of that, I'm not quite sure I can answer correctly.

Q. Well, you took general ledgers home with you, didn't you?

A. I did.

Q. And you agree that general ledgers are the confidential information of AmeriPro, correct?

A. Not public.

Q. I'm sorry?

A.    Not public.

Q.    Different question:  You agree that general ledgers of AmeriPro are its confidential information, correct?

A.    I would say as a whole, the data in there is confidential.

Q.    Okay.  Please turn to Exhibit -- or to Page 166 of your deposition.  And on Page 166 -- I'm sorry.  First turn to Page 162 and you see at Line 8 that we were talking about, the general ledger for AmeriPro for 2014, do you see that?  Do you see that?

A.    I see the highlighted area.  You never told -- okay. Yes.

Q.    And then the question:  "This is information you obtained electronically on AmeriPro's computer network, correct?"

Answer:  "Correct."

Do you see that?

A.    Yes.

Q.    And then turn to Page 166 while we are talking about that exhibit.  Line 6:

"Did you understand that you were required to keep it confidential?"

Answer:  "I didn't -- was I required to per the agreement?  My understanding confidential information would have been information that AmeriPro provided me and this

information certainly, I guess, could fall into that category."

Question: "You knew you weren't allowed to just give it out to members of the public. It's internal financial information, correct?"

Answer: "Absolutely. Absolutely correct. I would never do that."

Question: "And you understood then that it was AmeriPro's confidential information that you have in these generally ledgers, correct?"

Answer: "I would agree."

Did I read that correctly?

A. You did.

Q. And that's information that you represented to the Court, you didn't have at all?

A. I'm sorry.

Q. You represented to the Court that you didn't take any confidential information when you left?

A. Well, again, the terminology is not necessarily my forte as far as the legal definitions of all these items.

Q. Were you confused about the fact that the personnel records of other employees including their salaries, did you think that was public and nonconfidential?

A. Again, that was records that I kept to show what expenses were supposed to be applied to our branch. So there were records I was keeping for my claim.

Q.   So, for instance, you needed Ms. Strange's employment agreement for your claim; is that your testimony?

A.   I had a copy of it.  I don't necessarily -- necessarily know if I needed it, but I had a copy of it.

Q.   You took it, didn't you?

A.   I made a copy of it.

Q.   You took a copy home with you, didn't you?

A.   I had a copy at home.

Q.   And you knew that her salary information, her employment agreement was her personal information, correct?

A.   She's no longer an employee of the company -- wasn't an employee then at all.

Q.   It was her private personnel information and her salary, correct?

A.   It was private information that was shared with me as her supervisor.

Q.   At AmeriPro?

A.   AmeriPro, that's right.

Q.   It's confidential personnel records, what someone makes, correct?

A.   I would say that's correct.

Q.   And you took it home with you?

A.   I did.

Q.   And that's part of the confidential information you represented to the Court you didn't have at all?

A.   Again, the definition of those items -- I wasn't clear on what confidential definitions we were talking about, information we were talking about.

Q.   So you were confused about whether you can take personnel records for other people home?

A.   I was confused what they were trying to identify, correct.

Q.   Okay.  Were you also confused about whether you could take home credit scores for consumers of AmeriPro?

A.   I wouldn't say confused.  I don't -- again, I made records of several items, several things.

Q.   You understand that a credit report that was submitted to AmeriPro by consumers, it list what bank accounts they have, doesn't it?

A.   No.  It lists the creditor account numbers that are truncated.

Q.   Did you --

A.   It doesn't leave bank account information on a credit report.

MR. BEHRENS:  Do you have a redacted copy of the credit report that you could pull up?  There we go.

Q.   (BY MR. BEHRENS)  The credit report lists what their credit was with various banks and other vendors with whom they had --

A.   Credit.

Q. Credit?

A. That's correct.

Q. That's not public information that you're free to disclose, is it?

A. No.

Q. It includes what their credit score is; you're not free to disclose that, are you?

A. I'm free to disclose it to the borrower.

Q. To the borrower?

A. That's correct.

Q. You are not permitted to take it home in a box as an employee of a competitor, are you?

A. I wasn't an employee of the competitor when I took the information and made copies. I made copies, again, to protect myself.

Q. The entire time you've been the Austin area sales manager for Oak Mortgage, you've had that information with you, correct?

A. Sealed in a box.

Q. That you had with you, correct?

A. Correct.

Q. And you also had their social security numbers with you, didn't you?

A. Correct.

Q. You understood that the social security number of a

borrower of AmeriPro is confidential information, didn't you?

A. I understand that.

Q. And you understand that federal regulation prohibits you from taking that information, don't you?

A. I do now, yes, sir.

Q. Well, and as a licensed loan originator, don't you feel like you needed to know what the federal regulations were at the time you took it?

A. Well, again, each -- the regulations are fluids changing constantly. So with respect to being up-to-date on every regulation, every statute, that's a challenge.

Q. Regardless of Regulation P, was there some reason you thought you were entitled to take social security numbers of borrowers home with you?

A. I wasn't entitled, no, sir.

Q. It's confidential information, not only of AmeriPro, but of those borrowers and you took it?

A. I made copies of those records.

Q. And by the way, Regulation P, you understand is a set of regulations to enforce the Gramm-Leach-Bliley Act, correct?

A. It's my understanding.

Q. In other words, it clarify -- it explains in more detail what Gramm-Leach-Bliley provides, correct?

A. That's my understanding.

Q. And Gramm-Leach-Bliley was enacted in 2000 before you

were even licensed, correct?

A. Again -- my understanding again with Reg P and the security that we're talking about or the, I guess, privacy of this information, I was not enacted or written, put in place until 2014.

Q. You knew that you were taking AmeriPro's information home for a purpose other than what AmeriPro had given you consent to have it for, right?

A. The purpose was to make copies and records to protect myself.

MR. BEHRENS: Objection, nonresponsive.

THE COURT: Sustained.

Q. (BY MR. BEHRENS) You knew that you were taking AmeriPro information home with you for a purpose other than what AmeriPro had given you consent for, correct?

A. Correct.

Q. And the day before you resigned from AmeriPro, you also, in addition to this bankers box, downloaded on a thumb drive information about a AmeriPro borrowers and loans that hadn't even closed yet, correct?

A. Correct.

Q. And loans that haven't closed yet is not public information, is it?

A. No.

Q. And you understand that under Regulation P that's

nonpublic private financial information of those borrowers that you had in your possession, correct?

A. I had it in my possession.

Q. And you took it home too, correct?

A. Correct.

Q. You understand that was confidential information, not only of AmeriPro but those borrowers, correct?

A. I kept it confidential.

Q. You knew --

MR. BEHRENS: Objection, nonresponsive.

Q. (BY MR. BEHRENS) When you took it, you knew it was confidential information not only of AmeriPro, but of those individual borrowers, right?

A. When I copied it and kept it at my house, it was confidential.

Q. All of the information you took when you resigned relating to AmeriPro borrowers was information you obtained off of AmeriPro's computer system, correct?

A. Correct.

Q. You didn't obtain any of that information from public sources, did you?

A. No.

Q. And you understand that under Regulation P, even if information's available on a -- from a public source -- are you with me so far?

A.    I'm with you.

Q.    Under Regulation P, you derived that information from something a borrower submitted to the lender.  You're not allowed to take that.  It's protected too.

Do you understand that?

A.    I do now.

Q.    And so instead of going to public sources, you went to the one source that you're federally prohibited from going to, to take that information, correct?

A.    It was the only access of the information I had to protect myself with the data, correct?

Q.    Well, you've gone through this scenario where you say that some of this information is available publicly, correct? But you didn't go to the public source.  You just took a computer copy that a federal regulation barred you from taking, right?

A.    You're talking-- I'm not understanding the question when you said, "We spoke about something before."

Q.    Bottom line, you didn't go to any public source to take any borrower information, did you?

A.    No.

Q.    You took it all off of AmeriPro's protected website and computer network, correct?

A.    From their network.

Q.    That you had to login to with a password to access,

correct?

A. The data that I had probably was -- majority was saved on the C: drive of that laptop.

Q. You are the one who saved AmeriPro documents on to the C: drive of your laptop, correct?

A. Correct.

Q. In other words, in order to move it over to the C: drive on your laptop, you had to first login to the AmeriPro network, correct?

A. In certain instances.

Q. And then you moved it to the C: drive on your laptop, right?

A. In certain instances.

Q. And the importance of the C: drive, the local drive, that way AmeriPro won't know what you're doing with the information that's on your local drive of your laptop, correct?

A. No, sir.

Q. It's not backed up onto AmeriPro's network if you have it on the local drive of your laptop, correct?

A. Everything I ever had was backed up to AmeriPro networks, absolutely.

Q. Is your testimony that if it's on the C: drive, the local drive, that it's backed up?

A. If I had it on my C: drive, it would have been on the network, correct.

Q. Originally. But the copy that you made on the C: drive --

A. The copies.

Q. -- if you made edits, if you forwarded it --

A. If.

Q. -- to someone else --

A. If.

Q. -- AmeriPro wouldn't be able to tell if you sent it, for instance, to Oak Mortgage, would it?

A. They would not have been able to, I guess.

Q. So by having it on the local drive of your computer, you are able to send it any where you want without being detected, correct?

A. If I chose to, I believe.

Q. At no point until you produced documents in this litigation did you ever tell AmeriPro that you had taken any of its confidential financial information; is that correct?

A. Up until the time I was asked, no, sir.

Q. And in terms of the financial records of AmeriPro that you both printed in hardcopy form and downloaded -- or put into the C: drive and took a thumb drive of -- are you with me so far?

A. I'm with you.

Q. None of that information was available in a public source that you're aware of, correct?

A.   Not that I'm aware of.

Q.   You took it off of AmeriPro's computer network that you had to access through a password, correct?

A.   Correct.

Q.   And I had asked you earlier about general ledger. You knew that those were internal financial documents that you were contractually required to keep confidential, correct?

A.   Well, I mean, there was never specific in the agreements of the general ledgers and, like, that.  I just felt like that, that -- there was probably data with -- in there that could be identified as maybe possibly confidential.

Q.   You understood -- the testimony we read from your deposition, you admitted earlier --

A.   Again --

Q.   You understood that you --

A.   -- the definition is certainly not something that I'm privy to and when we were talking about what was confidential and not confidential.

Q.   My question:  "You understood that you were contractually required to keep that information confidential, correct?"

A.   And I have.

Q.   Other than taking it with you without permission from the owner of that information, correct?

A.   Correct.

A. I don't know if that's the only three on the website, but there's more than that in Austin.

Q. My question though is:

In terms of who AmeriPro -- or Oak Mortgage says are its employees in Austin, it's the three of you that are listed on the website, correct?

A. We are listed as the sales team, correct.

Q. And all three you, the entirety of the Austin branch of Oak Mortgage, have copies of our confidential information, correct?

A. No, sir.

Q. You do, don't you?

A. I don't. Not any longer.

Q. Mr. Nasserfar had thumb drives full of our spreadsheets that he has returned, correct?

A. Again, I don't have Mr. Nasserfar's information. I don't have copies of that information.

Q. Is it your testimony that you and the vice president of Austin for Oak Mortgage have copies that Oak Mortgage doesn't?

A. Yes, I do. That's my testimony.

Q. The day before you resigned from AmeriPro, you also took copies of its profit and loss reports off the computer system, correct?

A. Correct. I don't -- I'm not sure about that date, to

be honest with you. The day before, I don't believe so. I don't think I copied or downloaded anything the day before.

Q. No, Mr. Nasserfar is Oak Mortgage's vice president of Austin, correct?

A. That's correct. That's his current title.

Q. You're aware that Mr. Nasserfar has a hard drive on which he also downloaded AmeriPro confidential information, correct?

A. I'm aware that he has a hard drive. I don't know what he downloaded.

Q. If you turn, please, to Page 27 of your transcript.

Line 3: "Excluding anything Mr. Bundren told you, are you aware that Mr. Nasserfar had one or more USB devices with AmeriPro confidential information on it?"

Answer: "One, yes."

And then Line 12: "And you're aware that Mr. Nasserfar had that USB device in his possession as recently as this month, correct?"

Answer: "I do."

Did I read that correctly?

A. Yes. And I -- again, my answer is there just regarding, "Did I know he had a device?" I didn't know what was on the device.

Q. Well, the question was, "Did it have --

A. I understand what your question was here. I'm seeing

at any point in your employment, correct?

A. I delete all of my text messages every day as a regular habit.

MR. BEHRENS: Objection, nonresponsive.

THE COURT: Sustained.

Q. (BY MR. BEHRENS) Whatever your regular practice is, you actually knew of the prospective litigation with AmeriPro back on December 11, correct?

A. Because they had litigated and sued other previous employees, yes.

Q. So is that a yes? Okay.

And after that, you deleted every text message that existed before then, all the way through January 20, after you left the company, correct?

A. Yes.

Q. You didn't preserve any text messages that existed at any point before you started with Oak Mortgage, correct?

A. Never have, no, sir.

Q. And when -- when Oak Mortgage agreed to indemnify you, you continued to work in a fiduciary role for AmeriPro as its agent for another month, correct?

A. I didn't enter into any agreement with them until after I was employed. It was after my resignation, excuse me.

Q. After the December 11 conversation, you continued working as a fiduciary for AmeriPro for another month, correct?

A. I did continue to work for AmeriPro for another month, yes.

Q. So -- and you were also storing and taking AmeriPro's confidential information, you say, to use for this potential litigation while you're at the same time deleting these text messages, right?

A. One had nothing to do with the other, but correct.

Q. Well, one preserves the evidence and one destroys it, correct?

A. I wasn't thinking in those terms. I'm not an attorney.

Q. You manually deleted the text messages? You had to go through and --

A. Yes.

Q. -- and specifically delete them?

A. Yes. Yes.

Q. And not only were you a fiduciary for AmeriPro, you were also the co-manager at the Lakeway branch for that full month, correct?

A. Correct.

Q. And in addition to AmeriPro's general ledgers, you also took copies of AmeriPro's internal pro forma after you resigned, correct?

A. Correct.

Q. And the pro forma, of course, gives a blueprint of

what AmeriPro's planning to do in the future with that branch, correct?

A. Correct, never came to fruition.

Q. You never once asked any of the consumers, whose information you took home with you, you didn't ask any of them for permission to take their financial nonpublic data home with you, did you?

A. I did not.

Q. You began working with AmeriPro in 2011, correct?

A. Correct.

Q. While you were still employed with AmeriPro, Oak Mortgage asked you about your referral sources at AmeriPro, correct?

A. I don't know if I recall that.

Q. If you turn to Page 206 of your -- never mind.

Your employment agreement with AmeriPro has a nonsolicitation clause, correct?

A. It does.

Q. And under your employment and contract with AmeriPro, you understand that you're not allowed to solicit business from anyone who became a referral source after you were employed at AmeriPro, correct?

A. Client, payor, supplier.

Q. My question was different.

Under your contract, as you understood it,

you're not allowed to solicit business from anyone who became a referral source after you were employed at AmeriPro, correct?

A. Well, a little confused about, again, the language in the agreement as well as the question because neither -- they are not both mentioned. You're talking about a referral source; the agreement talks about other, you know, labels and -- so it's hard to say, you know, where those labels are attached.

Q. So when I asked you in deposition about referral source, you thought referral source was something other than referral source?

A. No.

Q. Is that the confusion?

A. No. The confusion is what's in the agreement.

Q. If you turn to Page 112 of your transcript.

And you understand that the contract is memorializing your understanding with AmeriPro? That's what the contract is, the mutual meeting of the minds, correct?

A. Okay. If you say so.

Q. On Page 112, Line 22, "If you developed a relationship with a referral source after you began at AmeriPro, do you believe you can solicit to them?"

Answer: "Does that mean a new referral source after I started with AmeriPro?"

Question: "Yes."

Answer: "If it was a new referral source, I wouldn't solicit them. They can solicit me. They can call me, but I can't solicit them."

Question: "And you can't solicit them under the employment agreement as you understand them" -- "understood them, correct?"

Answer: "It's my understanding for 12 months."

Did I read that correctly?

A. You did.

Q. And turn also to Page 111, Line 23.

Question: "Who do you believe you can solicit business from?"

Answer: "Any client, customer, business referral, realtor source that I knew prior to AmeriPro Funding."

Did I read that correctly?

A. Yes.

Q. And those weren't my words. You actually volunteered that. The group of people you can't solicit to when you answered my question include "business referral and relator source that you knew," correct?

A. That's my words.

Q. Is it your testimony now that builders are -- were not AmeriPro clients?

A. I don't believe they are AmeriPro clients.

page, correct?

A. It was produced by AmeriPro Funding.

Q. Different question:

You put it on your LinkedIn page as a link?

A. I did, yes.

Q. And immediately after your deposition, you deleted this last page off your LinkedIn profile, didn't you?

A. I deleted this, yes, I did.

Q. And it was because it referred to them as your -- as clients of AmeriPro, isn't it?

A. No. I didn't want my namesake next to AmeriPro's anymore.

Q. Over one month before you resigned from AmeriPro, Oak Mortgage told you that you can solicit your book of business from AmeriPro, and you can solicit your past customer database, didn't they?

A. They may have made that inference, but doesn't mean I did as such.

Q. Turn with me to Page 56.

A. 56. Yes, sir.

Q. Do you see a series of checkmarks? Can you go four checkmarks down?

A. I see the checkmarks.

Q. At the end of the first line, it says, "You can maintain and solicit to your book of business and your builder

192

realtor relationships. You can maintain and solicit to your past database."

Do you see that?

A. I see it.

Q. And Oak Mortgage sent you this more than a month before you actually resigned from AmeriPro, correct?

A. It looks to be December 10th.

Q. So while you were still acting as a fiduciary for AmeriPro, you were having a discussion with its competitor about the extent to which you could solicit business for Oak Mortgage, didn't you?

A. I did not have that conversation directly, no, sir. This information was sent to me, but I did not have that conversation.

Q. By your current employer, correct?

A. Right. They sent this information to me, but I did not have that conversation.

Q. They're having this conversation in this e-mail, aren't they?

A. It's addressed to several people there, that's correct.

Q. And what Oak Mortgage, one of the parties in the lawsuit, whom we've sued, what it said is that you can solicit your book of business and your customer database, right?

A. That's what this says there. That's their opinion, I

guess, at that moment.

Q. So they weren't concerned about the differentiation between a borrower and a referal source. They said, "Solicit from everyone who is a customer."

A. I don't know what they were concerned about or what they were trying to differentiate at the time.

Q. That's what they wrote. That you can solicit your customers?

A. You would have to talk to the gentleman who wrote the document.

Q. I'm asking you to read what they wrote. They said: "You can solicit" --

A. I see what they wrote.

THE COURT: I need you-all to stop talking all over each other.

THE WITNESS: I see what they wrote but, again, I didn't write it.

Q. (BY MR. BEHRENS) And that's the very -- it's the very next day after this e-mail that you and Oak Mortgage had the discussion about Oak Mortgage indemnifying you in a lawsuit against AmeriPro, right?

A. The previous document that you showed earlier that's on the 11th?

Q. That's right.

A. Okay. Yes.

Q. And then you continued acting as a fiduciary for AmeriPro for a full month after having these discussions about solicitation of its clients for a competitor, right?

A. I still was employed at AmeriPro for a month, yes.

Q. You're also aware that under your contracts with AmeriPro, you're not allowed to solicit or hire anyone who worked at AmeriPro, correct?

THE COURT: Mr. Behrens, is this a good place to stop for a --

MR. BEHRENS: Yes, Your Honor.

THE COURT: Whew, wishful thinking for the afternoon for a break.

MR. BEHRENS: Oh, for a break, yes. Thanks.

THE COURT: You may step down.

We are going to take a 15-minute break. It is 3:25 p.m. So we will start at 3:40 p.m.

(Break taken from 3:24 p.m. to 4:04 p.m.)

THE COURT: Sorry for the delay. You-all may be seated.

MR. BEHRENS: Thank you.

THE COURT: Okay, Mr. Behrens, you may proceed.

MR. BEHRENS: Thank you, Your Honor.

Q. (BY MR. BEHRENS) Sir, please turn to Exhibit 57.

A. (Witness complies.)

Q. Are you there?

A.    I see the YouTube logo.  Can they -- thank you.

Q.    You wrote, "Thank you for the update and direction."
That's what you wrote back, right?

A.    I see that, yes.

Q.    Other than to hide the fact that solicitation is
occurring, you can't think of any reason to wait one month to
go after the other person, do you?

A.    I don't know what other person we're referring to.

Q.    My question is different:

Other than to hide the fact that solicitation
was occurring, you can't think of any reason why you were being
given the direction to wait one month before going after the
other person, correct?

A.    I don't think it was in that context.  I don't think
that's correct.

Q.    Turn to Page 81 of the transcript, please.

A.    The transcript?

Q.    Yes.  Line 19.

A.    Slow down, please, sir.  81, did you say?

Q.    Yes.  Page 81, Line 19.

A.    Okay.

Q.    Question:

"Is there any business reason that you can think
of about waiting one month before you go after the other
person, other than to make it appear that it's not a

solicitation?"

Answer:  "You'd have to ask him.  No."

Question --

A.  "You would have to ask him."  Yes, that's correct.

Q.  You can't think of any other reason?

A.  Again, I don't know what the context or, again, you would have to ask Mr. -- you know, Mr. Thomas what he was referring to there.

Q.  But you thanked him for that direction, correct?

A.  I thanked him for the e-mail, yes.

Q.  Turn to Exhibit 58, please, the very next tab. Exhibit 58 is a series of text messages between you, Mr. Nasserfar, and someone at Oak Mortgage, correct?

A.  I don't know.  It doesn't look like this is my text messages.

Q.  Well -- and that's because you deleted yours, right?

A.  Not only -- from looking at this, this does not look like mine.  This is Mr. Nasserfar's.

Q.  Do you see at the bottom it's produced by Oak Mortgage?

A.  I see that, yes.

Q.  Okay.  On the very last page, the text at the top -- are you there?

A.  Okay.  The one that says "Group?"

Q.  The very top text is from someone that you're not

quite honest with you. It's just a list of names that folks we get referrals from.

Q. So Mr. Nasserfar sent you a list of all these folks at builder clients, and you don't have any memory of why you're getting this?

A. I don't. No, sir.

Q. Okay. You never worked for any Brohn Homes account matters before you came to work at AmeriPro, correct?

A. Actually, yes, I did.

Q. Please turn to Page 188 of your transcript.

Line 13, question: "When do you contend that you had a relationship with borrowers at Brohn? When did that first arise?"

Answer: "I rarely worked on the Brohn account. I would say over the course of the two years that Michael Nasserfar and I were working together as a team. I may have worked with three or four Brohn borrowers maybe when Mr. Nasserfar was on vacation, something like that."

Question: "And when -- was it as early as 2011?"

Answer: "No, sir."

Question: "It was after that?"

Answer: "It would have been after that."

A. I worked with Brohn prior to my employment at AmeriPro, but it wasn't the Brohn account.

Q. Exhibit 62.

A. Okay. And repeat the question?

Q. That's an e-mail you sent while you were still an employee of AmeriPro discussing a meeting that you and Mr. Nasserfar had with JB Goodwin, correct?

A. That e-mail, yes.

Q. And so while the two of you were still with AmeriPro, you met with a potential referral source at JB Goodwin, correct?

A. I met with a -- it looks like Judy Alloway.

Q. My question:

It was a potential referral source, correct?

A. It would have, I guess, been a potential referral source but that's -- again, most relators are potential referral sources.

Q. And you and Mr. Nasserfar weren't meeting with JB Goodwin as a potential referral source for AmeriPro, though, were you?

A. Just a general meeting. There wasn't really any substance or agenda for that. We networked and talked to relators on a daily basis.

MR. BEHRENS: Objection, nonresponsive.

THE COURT: Sustained.

Q. (BY MR. BEHRENS) You and Mr. Nasserfar weren't meeting with JB Goodwin as a potential referral source for

AmeriPro, were you?

A.   I wasn't meeting him for referral sources, no, sir, not with AmeriPro.

Q.   You knew that you were about to start with Oak Mortgage, correct?

A.   When the meeting occurred and I don't recall when the meeting was, but since -- this would be yesterday, so it would have been around January 14th.  At that point, I knew that I was trying to get -- resign from AmeriPro, yes -- in the process of.

Q.   Please turn to Page 178 of your transcript.

Line 23:  "And so when you were trying to look to JB Goodwin" --

THE COURT:  Hold on.  Hold on.

MR. BUNDREN:  Be just a second.

Thank you.

What's the line?

MR. BEHRENS:  178, Line 23.

MR. BUNDREN:  Thanks.

Q.   (BY MR. BEHRENS)  "And so when you were trying to look to JB Goodwin as a potential referral source, it was for you at Oak Mortgage, correct?"

Answer:  "I wouldn't say that 100 percent. Again, the meeting wasn't about any immediate business, any future business.  It was just an introduction."

Question: "Were you talking to her about being a referral source for AmeriPro?"

Answer: "No."

Did I read that correctly?

A. You did read that correctly.

Q. In Line 10:

"Did you advise anyone at AmeriPro about this meeting that you had with JB Goodwin on January 14?"

Answer: "No."

Did I read that correctly?

A. You did read that correctly.

Q. You're aware that any of your contract provision that made any prospect something that you could not divert away from AmeriPro, correct?

A. I'm sorry, say that again?

Q. Yeah. Your contract required that you not divert any prospect away from AmeriPro, correct?

A. I'm not 100 percent positive that's what it states. But I didn't think at this particular instance was anything of the sort -- such going on.

Q. My question is:

Are you aware whether Paragraph 5(f) of your employment agreement --

A. Can I see that, sir?

Q. Sure.

created, Windows artifacts that are within that date range, anything that looks like it could provide a clue as to how that computer was being used in the -- in the last couple of days or whatever the time frame given is.

Q. And the time frame given here was January 12th to January 15th, 2015?

A. Correct. Yes.

Q. And was that your understanding is that -- that were the days -- the days right before Mr. Task resigned?

A. That's correct.

Q. So on Mr. Task's laptop, what were you able to determine based on that initial evaluation?

A. I found through the Windows Registry examination that there was one drive, one USB hard drive, that was connected to this computer on the 15th and that was about 1:51 p.m., and then there were -- I think I produced 15 link files to show files that were being written to or created within that same time frame.

Q. Okay. Stop there. What do you -- what's a link file that is written to or created? What does that mean?

A. Link file is a shortcut file. If you use a Windows machine and you have the little icons on your desktop, that's a shortcut. When -- when you open -- when you access a -- a Word document, a link -- Windows will create a link file in the recent documents folder and it just -- it tells Windows

everything it needs to know about that parent file. So I don't know if you've ever -- if you use Word and you -- you open Word the first time, you get a drop-down list of all the documents you have recently edited. That's where that comes from. Windows pulled that from a couple different places. But it's simply something that Windows does to track the file that you open so that the next time you open it will be a lot faster and you'll be happy with Microsoft.

Q. To backtrack a little bit, you saw that a USB device had been installed on January 15th?

A. Correct.

Q. All right. What is the recent activity, what does that mean to you?

A. To me it means -- means very little. I just -- I will produce those files and the link files that are created with that date range back for other people to look at, and then they'll look at the file names and they will know whether or not that was important or not.

Q. Are those link files noted in your report --

A. They are.

Q. -- Exhibit 43?

Where are they?

A. There should be an attachment. Yeah. The list of those link files is Exhibit 1. It's A -- APF 00028187.

Q. Okay. What else did you note in examining Mr. Task's

computer?

A. I noticed a series of folders that had been deleted.

Q. What date?

A. They -- the dates they were deleted is not absolutely known. We know that they were last written on January 15th, which would be the last activity that something occurred to these folders before they were deleted. That could very well be the deletion date.

Q. And what else about that, how many deletions or what -- if you look at your -- if you want to refer to your report.

A. Yes. The -- that's Exhibit 3 and it's APF 00028190 and there was a list of 62 folders that were deleted. What was -- what I noticed about this is where they reside. They reside off the root of C: and they appeared to be company information or a folder that contained company information. So the logical path in which they reside was C:\mtask-ameriprofunding-clients-2012. So I made this available to the reviewers with a note saying, "Look at this. It's not typical for corporate data to reside on the root of a C: drive because the IT people can't manage it." They can't back it up and -- and keep up with the company data. So that may be important and it may not be. The reviewer would know that.

Q. All right. So just so I understand that, what you're

saying is there were -- there was a lot of AmeriPro information on the local drive or the C: drive on the laptop?

A. Correct.

Q. All right. And that there was evidence of deletion of folders?

A. That's correct.

Q. Your report talks about folder content. What -- what are you saying about that?

A. Yeah, they -- because the folders are deleted, anything contained within those folders would also be deleted. So there were hundreds of files within these 62 folders that once the folders become deleted, they -- they, themselves, also are deleted from -- from the hard drive.

Q. So are you saying that someone had to intentionally delete folders and files?

A. Yeah, there's -- there's been a folder deletion. Somebody deleted the folders or something deleted these folders, correct.

Q. And how many files were deleted did you find?

A. 911 files.

Q. Did you look at Page 3 of your report under the heading "Deleted Files"?

A. Yes. That's what I am looking at now.

Q. All right. So the last paragraph, are you reaching some sort of at least preliminary conclusion about what you've

examined on the computer?

A. Yes.

Q. What is that?

A. Yeah. I just told someone to pay attention to this. It's -- it would be consistent with files being copied or archived and removed immediately prior to being deleted.

Q. Being removed to?

A. Well, if you have a USB device that's plugged in before a bunch of files that -- that get deleted, then that would be consistent with the activity of -- of copying files and deleting files.

Q. Is that what you saw here, the USB device was inserted and then short -- within minutes a bunch of file folders were deleted?

A. That's what I'm seeing, yeah. I'm just making people aware that, you know, look at this. It might be important.

Q. Now, you --

MS. BURTON: We would ask that Exhibit 43 be admitted, Your Honor.

MR. BUNDREN: It's already marked as --

MS. BURTON: Is it?

MR. BUNDREN: -- a deposition exhibit.

MS. BURTON: Okay. It's already admitted. Never mind.

MR. BUNDREN: I think it's, I believe, 153; is

what it was, and that's when I -- like I said, I was expecting to find forensic images, a production of forensic images, and when I started to review it, I found that it was actually some kind of e-discovery production.  It contained a series of folders that appeared to be named after devices like computers and laptops and -- and e-mail accounts and then within those folders was what I would call a select production of files.

Q.    And I think it was actually Exhibit 48, which is not 45 like I said; is that right?  48, is that what you are referring to?

A.    I'm looking at 40 -- 48?  Yes, that's -- yeah, it's 48.

Q.    So --

A.    That's correct.

Q.    So tell me what does 48 represent again?

A.    That's correct, yes.

Q.    What does that represent, 48?

A.    That is the -- the root structure of item 14 of that -- that USB device is what's on it.

Q.    So, explain what -- on 48 it's got a list of certain things.  What are those?

A.    Yes.  And when I looked at, I don't know what the control numbers are.  I would say that COC-001 through 24 is some kind of internal control number for somebody.  The naming convention when I see it explains to me that it is devices

belonging or used by certain people. For instance, COO -- or COC-001 would be an external hard drive used by Nasserfar, 002 would be a thumb drive used by Task and on down the line. So when I first saw this, it told me that it was some kind of selective production from those devices that was organized in these folders and put on the hard drive that we received.

Q. Why do you say "selective production"?

A. Because it's not the original device. It doesn't have the file system metadata or any other artifacts that a forensic examiner would need to authenticate the evidence.

Q. Okay. So these were not forensic images?

A. These are not forensic images.

Q. So you say it doesn't have the metadata. What do you mean by that?

A. The file system metadata is -- is what an examiner needs to determine authenticity that is specific to each device. It will be a master file table. It will be the unallocated clusters. It would be the file select. It will be the recycle bin artifacts for that device. It will be bitmaps. It will be all of those -- those things that are specific to a device like card catalogs and shelves are specific to a library.

Q. So how does that hamper the investigation?

A. I don't know -- I don't know where any of this data come from other than somebody named a folder and says it comes

deleted with system artifacts that show that folders were deleted, that -- actually, they were copied to this device on the 15th -- on May the 15th. They had to be deleted sometime after that date because they can't be deleted before they exist, that there -- there are items in the recycle bin, additional folders, that were actually placed in the recycle bin on the 19th and recycling in itself is a -- is, for all basic -- practical purposes, a deletion process and the unallocated clusters on this device are zeroed out. So normally when you find deleted artifacts like this or you find recycle bin artifacts, you can forensically recover them or at least -- at least fragments of them, but the unallocated clusters on this particular device contains nothing but zero values so -- which is indicative of -- of unallocated clusters being wiped, being basically sterile, contains no data.

Q. Would you look at Exhibit 50 -- I'm sorry, 49.

A. 49?

Q. Yes, sir.

A. Okay.

Q. Was that -- was that produced -- or made -- a copy made from what was produced by Oak Mortgage's screen shot?

A. Yeah. It appears to be a -- a property listed in Windows on a device -- on a file name p&lnasserfar.xlxs.

Q. And what -- and where does it -- based on your analysis, where did this come from, the document that it refers

to? Where was it found?

A. It was on -- it was on 14 or -- item 14 or item 17. I'm not sure which.

Q. All right. If you look at that, what does this "Last saved by" mean and -- what does that mean?

A. "Last saved" is -- this is document metadata. It's not file metadata, it's document metadata. It's embedded into the document itself. It's -- it's a part of that spreadsheet. "Last saved" would be a Microsoft element and what it's telling you is when this last pulled up in Excel and saved, the last -- it was last saved by Jackson Thomas. Where Microsoft gets that information is from user accounts. So I would say that this was on a computer with a user account named Jackson Thomas and it was last saved on -- on December 17th, 2014.

Q. What document is it referring to that was saved?

A. That's the p&lnasserfar spreadsheet.

Q. Do you know who Jackson Thomas is? Are you aware who Jackson Thomas is?

A. I have no idea.

Q. Okay. And then if you look at Exhibit 50, what is that indicating?

A. Well, this file -- this file -- we're actually looking at that folder because it's a folder name COC-018. It would be on item 17. And we're looking at the -- again, the -- the property that's displayed by Windows of the p&lnasserfar

spreadsheet.

Q. Let's compare 49 to 50 again. Is there something different that's been added on 50?

A. When -- yeah. When you look at that folder structure you're looking at -- on item 50 you're looking at the COC-18 [sic] Jackson Thomas computer folder. There's two files that reside in that folder. It's LO.docx and the p&lnasterfar -- which somebody misspelled Nasserfar looks like -- but p&lnasserfar.xlsx, and then when you look at item 50, you'll see we're -- we're looking at the COC-018 folder of item 17 and it has a -- a PDF of what looks like it's been created from the p&lnasterfar Excel spreadsheet, but the name is now spelled right in the PDF and the LO.docx file is missing and the thumbs.db file is the Windows artifact.

Q. All right. So if I understand correctly, 49 and 50, which one's for -- 49's from which device -- which --

A. 49 is -- will be the first one we -- let me see. 49 would be -- yeah, 49 would be the first hard drive we received, which would be item 14.

Q. All right. And 50 is from the second item we received?

A. Yes, and that would be item 17.

Q. Is it 17 or 19?

A. That is a good question. It may be 19.

Q. Okay. All right. So in other -- just to wrap this

up, so what does this tell you about what was happening in the production by Oak on these hard drives, the difference between these two exhibits?

A. Well, in the -- to start with I was expecting forensic images of the source media on both of these and it's not there. The first one is some kind of selective file production that's in folders that contain names that tend to identify devices and people. The second production ends up being almost the same data without the names that identify people and computers with some differences in files that exist and files that don't exist and containing system artifacts, system metadata, specifically master file table records that show that files -- or folders, rather, have been deleted from this device as well as folders being placed in the recycle bin, and we actually have the security identifier of that recycle bin so we can track that back to find out who did it if we had the devices or if we had the domain controller.

Q. Were you able to determine how many files were destroyed or deleted?

A. Ask that again.

Q. How many files were destroyed or deleted, were you able to determine that?

A. We were. Is it an exhibit? I don't remember off the top of my head.

Q. I don't know that it particularly --

A. Yes, it looks like it's here. It's going to be -- there's 142 lines in this spreadsheet.

MR. BUNDREN: What exhibit is that?

Q. (BY MS. BURTON) Yeah.

MR. BUNDREN: What exhibit are we --

Q. (BY MS. BURTON) What are you looking at, Roy?

A. I'm looking at --

MR. GARCIA: 46.

Q. (BY MS. BURTON) Exhibit 46?

A. Yeah. That's -- that's item 46, correct.

Q. Okay. So tell us again what -- how many --

A. So this is the list of all of the folders that were deleted from the second USB drive and you'll note that they were created on the 14th and last written on the 14th and are deleted. So they -- they had to be deleted at the 14th. But when you look at the list, you'll see there's a 142 total lines in the spreadsheet. The first one doesn't -- the first three don't count. No, the first two don't count because they're headers, so there would be 140 folders deleted from this USB hard drive.

Q. This was which thumb drive? Who -- who was -- whose name was on it?

A. This would be --

MR. BUNDREN: Objection, form, referring to a thumb drive.

Q.   (BY MS. BURTON)  Flash drive.

A.   Yeah.  Well, it's an external hard drive.  This will be the one that didn't have the folder that contained the names of the people and the computers.  It was the second one received.  It's the one I've been calling 17.

Q.   If you look on Exhibit 46 at the top, it says, "All folders resided in the COC-002 folder on the USB hard drive before they were deleted."  Is that correct?

A.   That's correct.

Q.   And that COC-002, does that refer back to -- so you can identify where it came from?

A.   Well, that's the folder that resides on this -- on this media and if you look at the -- item 14, the first media, you'll see that COC-002 is identified as the Task thumb drive.

Q.   Okay.  That's how they identified it when they produced it?

A.   That -- the first time, yes.

Q.   If you will look at Exhibit 47.

THE COURT:  Is this a good place to break?

MS. BURTON:  Sure.  Yes, Your Honor.

THE COURT:  I mean, if you've got a little bit more to just close out --

MS. BURTON:  Yeah.  I can close out with him and --

THE COURT:  That's fine.

MS. BURTON: -- and then I can be done.

THE COURT: Okay.

Q. (BY MS. BURTON) So, Mr. Rector, looking at Exhibit 47, that also refers to a COC number, correct?

A. Yes. That's the recycle bin on the second hard drive and those are basically active artifacts. They were moved into the recycle bin. They have not been deleted as far as the file system is concerned, as far as the MFT records reflect. So they could be -- if it -- if you have that hard drive and it -- and you -- you tried -- tried to restore it, if they were there, they would restore. What this shows -- reflects is the -- where they were -- resided before they were recycled and the date they recycled, and you'll see the original path. That COC -- or COC-001, all of these folders were deleted from that root or that parent folder.

Q. What did they name -- what did they -- what did they name the folder? If you look at COC-001.

A. Yeah. That's what it's named on this drive, but on the first drive they produced, it had -- they named and identified it as, yeah, "Nasserfar External Drive."

Q. So -- okay. So those were folders that were recycled off of that drive?

A. Yes. And back on 40 -- is it 47? Yeah. The recycle bin is associated to a domain user and that's that first line. You'll see that big long SID number. For short, you can just

# APPENDIX
# TAB 3

REPORTER'S RECORD
VOLUME 3 OF 4 VOLUMES
TRIAL COURT CAUSE NO. D-1-GN-15-000785
APPELLATE COURT CAUSE NO. 03-15-00416-CV

OAK MORTGAGE GROUP, INC.,    ) IN THE DISTRICT COURT
MICHAEL H. NASSERFAR, MICHAEL )
E. TASK, and TYCORD R.       )
GOSNAY,                      )
                             )
                             )
        Plaintiffs,          )
                             )
VS.                          ) TRAVIS COUNTY, TEXAS
                             )
                             )
AMERIPRO FUNDING, INC.,      )
                             )
                             )
                             )
        Defendant.           ) 345TH JUDICIAL DISTRICT

--------------------------------

TEMPORARY INJUNCTION

--------------------------------

On the 27th day of May, 2015, the following proceedings came on to be heard in the above-entitled and numbered cause before the Honorable Gisela Triana, Judge presiding, held in Austin, Travis County, Texas;

Proceedings reported by machine shorthand.

A. I did.

Q. Okay.

MR. BUNDREN: Pass the witness.

THE COURT: Anything else, Ms. Burton?

MS. BURTON: No, Your Honor, we have no questions.

THE COURT: Okay. You may step down. Thank you. You may call your next witness.

MR. BEHRENS: Your Honor, we call Michael Nasserfar as an adverse witness.

(Witness takes the stand.)

MR. BEHRENS: And, Your Honor, while he is taking the stand, may I approach?

THE COURT: Sure.

MR. BEHRENS: Yesterday there was testimony that Regulation P was enacted in 2014. We wanted the Court to take judicial notice from the federal register. It was enacted in 2011. It was in place the entire time that Mr. Task and Mr. Nasserfar were employed at AmeriPro.

THE COURT: Okay.

Mr. Nasserfar, raise your right-hand.

(Witness sworn.)

THE COURT: Do you-all want these notebooks up here with him?

MR. BEHRENS: I'm sorry?

THE COURT: Do you want the notebooks up here with him?

MR. BEHRENS: Our notebooks, but not this large one --

THE COURT: Okay.

MR. BEHRENS: -- from opposing counsel.

THE COURT: I am just trying to get stuff away.

MR. BEHRENS: Yeah.

(Sotto voce discussion.)

MR. BEHRENS: And also, Your Honor, like yesterday we wanted to go ahead and give the witness and you copies.

THE COURT: That's fine.

MICHAEL NASSERFAR,

having been first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. BEHRENS:

Q. Mr. Nasserfar, please state your name.

A. Michael Hooman Nasserfar.

(Court Reporter requests clarification.)

THE WITNESS: H-O-O-M-A-N.

Q. (BY MR. BEHRENS) You resigned from AmeriPro on Friday, January 16, 2015, correct?

A. Correct.

Q. The following Monday, January 19, Oak Mortgage opened

a new Austin office with you as its vice president of Austin, correct?

A. Correct. Opened?

Q. Yes. And in addition to being vice president you are also Oak Mortgage's branch manager for Austin, correct?

A. Correct.

Q. Until you, Mr. Task, and Mr. Gosnay started working at Oak Mortgage on January 19, Oak didn't have a Lakeway office, did it?

A. I couldn't answer that question. I don't know where the Austin office was. I know that several employees lived in Lakeway. I'm not sure.

Q. Could you turn to your deposition at Page 25?

A. Would that be in this book?

Q. Yes. The one I handed you.

It says, question: "So in the Austin area, at least, the only one that exist is the one you were running in Lakeway; is that correct?"

Answer: "Yes."

THE COURT: Hold on. He's not there yet.

MR. BEHRENS: Oh, I'm sorry.

MR. BUNDREN: One second. What page are you on?

MR. BEHRENS: Page 25.

THE WITNESS: Page 25. What line?

Q. (BY MR. BEHRENS) Line 14: "So in the Austin area,

at least, the only one that exists is the one that you were renting in Lakeway; is that correct?"

"Yes."

Question: "And to your knowledge, there was no -- well, you said there was no Lakeway office prior to you and Task and Gosnay going to work for Oak; is that correct?"

Answer: "Yes."

Did I read that correctly?

A.   Yes, you read that correctly.

Q.   When Tom Grant started Centerra Homes in 2009, you were working with First Continental, correct?

A.   Correct.

Q.   But Mr. Grant used a different person, Roan King to handle Centerra's lender business, correct?

A.   Say that again?

Q.   Tom Grant, when he started Centerra Homes, used a different person named Roan King to handle the lender business for Centerra, not you, correct?

A.   I can't answer that.  I don't know.  He used several different people.

Q.   My point is, he's using several different people other than you.  You were handling the Guillen count -- account and he used someone else, correct?

A.   No. I'm not familiar with that account.

Q.   You were there when he testified, weren't you?

Q. (BY MR. BEHRENS) But again, in terms of the lender relationship with Centerra Homes that began when Mr. Grant approached you and had discussions with you and Chad Overhauser at AmeriPro, correct?

A. I think there's two unique things going on here. There's a lender relationship and a personal relationship and the two are pretty symbiotic.

I have a relationship with him personally, professionally and when he spoke to me, it wasn't that just all of a sudden out of the blue he decided to speak to me about me being at AmeriPro and working with him at Centerra.

Q. You did not handle the Centerra account until you were at AmeriPro, correct?

A. Correct.

Q. Let's talk about your time at AmeriPro.

You first became a manager at AmeriPro in December of 2012, correct?

A. I can't recall off the top of my head.

Q. Can you turn to Page 47 of your deposition.

A. Yes.

Q. Line 20.

A. You say 47?

Q. Page 47, yes.

A. Line 20.

Q. Question: "So you first -- would you agree you first

became a manager at AmeriPro in -- on December 1, 2012?"

Answer: "Correct."

Did I read that correctly?

A. You read that correctly.

Q. From that point in 2012 forward and till you resigned in 2015, you understood that you owed a fiduciary duty of loyalty to AmeriPro, correct?

A. I don't understand "fiduciary loyalty."

Q. Did you owe a duty of loyalty to AmeriPro during that entire time you were a manager?

A. I don't -- I --

Q. Turn to the very next page of your deposition, Page 48.

A. Okay.

Q. Line 9.

Question: "So when you became a manager at AmeriPro, did you believe you owed a duty of loyalty to AmeriPro?"

Answer: "Yes."

Did I read that correctly?

A. Correct. You read that correctly.

Q. You also understood that you owed a duty to devote your full-time attention to running the AmeriPro branch office, correct?

A. I believe I did so, correct.

Q. You understood that keeping borrower account numbers private was at the utmost importance under the law, correct?

A. Correct.

Q. You personally kept a copy of AmeriPro's confidential general ledgers even after you resigned from the company, correct?

A. I don't believe so. I would like to know what you're referring to.

Q. Turn to Page 130 of your deposition.

A. (Witness complies.)

Q. Sir, it's Page 130. You can't do it one page at a time to get there.

A. It's not a lot of pages at a time.

Q. Page 130, please, are you there?

A. Yes, sir.

Q. Question, Line 9: "And earlier we talked about this, and you testified that a general ledger would be confidential; is that correct?"

Answer: "A general ledger would be confidential information."

Then Line 19: "This came through your attorney pursuant to our request for production by AmeriPro. Did you provide it to your attorney?"

Answer: "Correct. I would have supplied this."

You had a copy of the general ledgers after you

resigned from AmeriPro, correct? That's how you were able to give it to your attorney?

A. I went on to say, in several different instances, I'm not sure of the 800 pages where it was produced whether via e-mail. There's several instances in this deposition.

Q. Were you testifying truthfully when you said, "Correct. I would have supplied this." Or were you being untruthful?

A. I was being truthful, sir. I'm just saying that this is a whole deposition. There's a different section in there where I stated there was 800 documents provided, and I don't know whether it would have been my supplying it or Michael Task or Ty Gosnay.

Q. You had a copy after you resigned from AmeriPro, that's how you were able to give it to your attorney, right?

A. I said in my deposition, I would like to see where it was housed and how it was given so I would know the exact location.

Q. Well, you didn't keep any copies of general ledgers because of any concerns about needing to protect yourself, did you?

A. There was a copy set that Michael Task had kept, and I didn't need to do a duplicate set for myself. I'm speaking on behalf of myself.

Q. Would you turn to Page 130 -- stay on 130 of your

deposition.

Line 23: "Why do you -- you still have a general ledger by branch which belongs to AmeriPro Funding in which you have testified as confidential?"

Answer: "I can't answer that. I don't know."

It's your testimony today that you did need it for protection?

A. Well, between Michael Task and I, we had maintained a lot of documents. He maintained it. I didn't have it. Your question was, "Did I produce it at one point to our attorney? And my response was, "I'd have to see where it was housed in order to know how that document was produced."

Q. You and Mr. Task gave an entire years worth of general ledgers, confidential general ledgers, to our competitor, Oak Mortgage, correct?

A. No. That's not correct.

Q. On Page 132, if you turn there, Line 12.

Question: "So your testimony is that either you or Mr. Task provided Exhibit 12, which is the general ledger by branch to Oak Mortgage?"

Answer: "Correct."

Did I read that correctly?

A. You did. Can I see Exhibit 12, please? So that I can actually see what we are talking about.

Q. I believe it's Exhibit 48 in the binder.

I'm sorry, 28.

And in the question, she actually identified it as the general ledger by branch, do you see that?

THE COURT: Hold on. He's looking for 28; is that what you said?

MR. BEHRENS: Yes.

A. This was not something I had in my possession.

Q. (BY MR. BEHRENS) The testimony on Page 132 was Exhibit 12 and that's the exhibit sticker on that exhibit, right?

A. Correct.

Q. And you answered "correct" when she asked you if you or Mr. Task gave it to Oak Mortgage, correct?

A. Correct.

Q. And the general ledgers provided you and Oak Mortgage a blueprint of all of AmeriPro's credits and debits for the entire year at that Lakeway branch, correct?

A. This was not given to Oak Mortgage.

Q. Despite your testimony, to the contrary in deposition?

A. This was not given to Oak Mortgage.

Q. So you're disputing what you said in deposition?

A. This was not given to Oak Mortgage, sir.

MR. BEHRENS: Objection, nonresponsive.

THE COURT: Okay. But you don't understand the

question.  Your deposition said that, that was correct.

So are you changing your testimony?

THE WITNESS:  At the time when I answered it, I answered it incorrectly.

Q.  (BY MR. BEHRENS)  So for at least three and a half months while you were still being paid to manage AmeriPro's branch office, you were negotiating with our competitor Oak Mortgage about getting a job there, correct?

A.  What are the specific dates that you're referring to, please?

Q.  If you turn to Page 23 of your deposition.

Line 12, question:  "So at least three and a half months while you were still employed by AmeriPro, while you are still being paid by AmeriPro, you are negotiating with Oak about getting a job there?"

Answer:  "Correct."

Did I read that correctly?

A.  Correct.

Q.  During that three and a half months, you systematically provided confidential information of AmeriPro to our competitor Oak Mortgage, correct?

A.  Incorrect.

Q.  Let's look at an example.

First, you received a job offer from Oak Mortgage by November 11, 2014; is that correct?

A. I don't recall off the top of my head. I'm sorry.

Q. Please open the exhibit notebook to tab 27. It's an e-mail that Oak Mortgage's senior vice president sent you on November 12, 2014.

A. In the deposition or in -- I'm sorry. I got confused.

Q. I said tab 27 of the notebook.

A. Sorry. I can get there fast. Sorry. Yes, sir.

Q. And the senior vice president wrote you that to make an upcoming meeting effective, "I will need some more information from you by the weekend." Do you see that?

A. Yes.

Q. And Oak Mortgage's list of things that he needed you to provide included AmeriPro's 2013 and 2014 profit and loss statements, correct?

A. That's what that e-mail states, correct.

Q. You knew that the competitor was asking for confidential information of AmeriPro, right?

A. It appears that they're asking for very specific items in their e-mail. I don't know if it's confidential or not. That's -- I'm not an attorney.

Q. If you turn to Page 125 of your deposition.

Are you there?

A. 126, 125, yes, sir.

Q. Line 17: "Was that something that you said earlier

that P&L was confidential information of AmeriPro, correct?"

Answer: "Correct."

Did I read that correctly?

A. You read that correctly.

Q. Exhibit 27 is an example of AmeriPro's competitor asking you for confidential information without AmeriPro's knowledge, correct?

A. Correct. They asked for information in that e-mail.

Q. Now, please open the exhibit notebook to tab 70.

Are you there?

A. Does it say "Offer Number 1" on top? Yes.

Q. Okay. On November 17, 2014, you gave a copy of the profitability report that's contained in this exhibit, correct?

A. I don't believe so.

Q. You were there when Holden Thomas, the designated representative of Oak Mortgage -- mortgage testified, weren't you?

A. Yes, I was.

Q. And on this very exhibit you heard him testify that you are the one who gave him that copy?

A. I gave him the report. I don't recall if this is the exact report.

Q. Well, this is the report he produced to us in that deposition --

MR. BUNDREN: Objection, form.

Q. (BY MR. BEHRENS) Correct? You were there?

A. I was there, and I don't remember off the top of my head.

Q. You don't remember that this report was brought that day?

A. No, sir, I don't remember.

Q. You did give him a copy of a profitability report, didn't you?

A. I don't remember the exact title of the report, but I gave them the report.

Q. At that meeting, on November 17th, correct?

A. Correct. At that meeting I did give him the report.

Q. And you heard him testify that he scanned it onto Oak Mortgage's computer, whatever you gave him that day, right?

A. I would have to see the -- I don't remember off the top of my head exactly what he said during his deposition.

Q. You provided -- whatever the report is that you -- will admit to have been provided that day, that was in direct response to Oak Mortgage asking you for the profit and loss statement of AmeriPro, correct?

A. Correct.

Q. The profitability report contains a list of borrowers of AmeriPro, the fees they pay and their account numbers, correct?

A. Specific to what account number are you referring to?

could give out publicly?

A.    No.

Q.    It's confidential information, right?

A.    I -- I think we have a different understanding of confidential.

Q.    Well, under your understanding, you are free to give loan numbers and the names of borrowers of the financial institution you work with to some third party; is that your testimony?

A.    No, sir.

Q.    You developed what you called a "builder centric model" when you were employed at AmeriPro, correct?

A.    I continued to use a builder model that I knew prior coming to AmeriPro.

Q.    Turn to page -- or to tab 75 of the exhibit notebook.

        In the middle paragraph -- are you there?

A.    Yes, sir.

Q.    You wrote, "The builder centric model I have developed here at AmeriPro," do you see that?  "The builder centric model I have developed here at AmeriPro," you wrote that, didn't you?

A.    I wrote that.  Prior to that, I put "I have been managing builder based mortgage platforms for the past 12 years for several local and national builders."

Q.    My question was about the builder centric model --

A.    I answered your question --

Q.    -- that you developed at AmeriPro.

THE COURT:  Guys, stop.  Stop.

THE WITNESS:  Yes.

THE COURT:  Do not talk over each other.  Stop.

THE WITNESS:  Sorry.

THE COURT:  I need you to wait for him to answer the question.  If you have an objection to his response, then I need you to make an objection.

MR. BEHRENS:  Yes, Your Honor.

THE COURT:  I need you to wait for him to finish the question before you answer.

THE WITNESS:  Yes.

THE COURT:  Okay.

Q.    (BY MR. BEHRENS)  You wrote that the builder centric model -- I'm not asking about the platform.  The builder centric model is something that you developed at AmeriPro, that's what you wrote, right?

A.    That's one sentence out of a paragraph that is being taken out of context.  I had been doing it for 12 years prior, to which, I defined prior to that sentence in order to be able to say I had history of doing this.  I didn't just start doing it at AmeriPro.

Q.    And you said that "The builder centric model I have developed here at AmeriPro is adding profitability, timely

closings, and assisting on making sales for our builder partners," did you write that?

A. Yes. I wrote that.

Q. Was that a truthful statement that you were assisting your builders with their profits and timely closings and sales?

A. I think I wrote it rather ambiguous and vague in regards to elicit a response from them; but to the extent I wrote that, yes, I wrote that.

Q. My question is different: Were you being truthful when you wrote it?

A. Was I being truthful, yes.

Q. Okay. Turn to Exhibit 67. That's your LinkedIn page as of March 25, 2015, correct?

Are you there?

A. I'm on 67. And what was your question?

Q. That's your LinkedIn page as of March 25, 2015, correct?

A. It appears to be. This is a rather working document but I don't know --

Q. Is that a yes?

A. It says March 25th on there so...

Q. As part of your work history at AmeriPro, you wrote on the second page, "Three plus years currently managing mortgage loans as the exclusive lender for three Texas-based builders at AmeriPro," do you see that?

A.    Yes, I see that.

Q.    And you're the author of that statement, aren't you?

A.    I don't recall if it was all my doing or if our marketing person at AmeriPro assisted and/or our -- I forget her compliance -- I forget her title, Rachel Fowler.  I had several people I had to check with before I put anything on there.

Q.    And then before you put anything on there, you're talking about your LinkedIn page?

A.    Correct.

Q.    But you are the one who put it on the LinkedIn page, right, that statement?

A.    Correct.

Q.    So what you represented to the public in Exhibit 67 is that you managed loans as "exclusive lender for three Texas-based builders," right?  Were you being truthful?

A.    Prior to that statement I also wrote seven years managing Meritage Homes Loans, Hammond, Legacy, Meritage.  Two years with Gehan Homes and I went on to say that I have been working three years with three Texas-based builders.

MR. BEHRENS:  Objection, nonresponsive.

THE COURT:  Sustained.

Q.    (BY MR. BEHRENS)  Were you being truthful when you represented to the public that you had -- it was an exclusive lender for three Texas-based builders at AmeriPro?

A. I was being truthful, yes.

Q. And the three builders you were referring to were Centerra Homes, Brohn Homes, and Clark Wilson, correct?

A. I would have been referring to those three builders.

Q. I'm sorry?

A. I would have been referring to those three builders.

Q. After your deposition in this lawsuit, you went back to that LinkedIn page and deleted that statement, right?

A. I recently have changed my LinkedIn. I've done it several times.

Q. So that's a yes to my question, you deleted that reference after your deposition, right?

A. I have.

Q. Please turn to Page 70 or to tab 76.

This is printed from a USB device you provided in discovery, and it's a November 26, 2014 expense report you submitted to AmeriPro for payment, correct?

A. It appears to be.

Q. And one of the things you asked AmeriPro to pay you back for was taking representatives from Centerra, Brohn, and other clients to dinner and lunches, correct?

A. There's a couple on there for that, correct.

Q. Part of what AmeriPro paid you to do was to build goodwill with its builder customers, correct?

A. It wasn't in my employment agreement.

Q. But that's part of what you did as your job was to build goodwill with these customers, right?

A. I believe so.

Q. The second to the last reimbursement expense you submitted, it lists Tamela Taylor and that's now Tamela Taylor Thompson, right, at Centerra Homes?

A. I know her as Tamela Taylor, but, yes.

Q. And you met with her just three days after you got a job offer from Oak Mortgage, right?

A. I can't recall the specific dates other than this date that's on this document.

Q. And that's -- two days -- though you remember after you gave Oak Mortgage a copy of a profitability report on November 17, right?

A. I don't recall off the top of my head the specific dates.

Q. Now, in your contracts with AmeriPro, you agreed that leads and loans in-process are the property of AmeriPro, right?

A. Yes.

Q. And you contractually agreed to provide AmeriPro a written list of all open leads, business prospects, and/or loans in-process as of the date of your termination, correct?

A. Correct.

Q. And you did have loans still on process when you left AmeriPro, right?

55

deposition.

A. I'm on 157.

Q. I'm sorry. Page 156.

A. Okay. I can get there fast.

Q. Line 18: "You didn't tell anyone at AmeriPro that you were resigning prior to resigning; is that correct?"

A. Did you tell anyone at AmeriPro that -- no, I didn't tell anyone at AmeriPro I was resigning until I resigned.

Q. I'm trying to find the quote. I'll have to come back to it.

AmeriPro's president and general counsel did try to call you after you resigned, correct?

A. Yes. I had some phone calls from --

Q. And you didn't return any of them, did you?

A. I didn't. There was nothing in the message that said anything explicit that they needed. They were just calling.

Q. After you resigned you never contacted or returned calls to anyone at AmeriPro to help with the transition of any of the loans that were in-process; is that correct?

A. I e-mailed the HR department, and I didn't get a response back. I don't process or underwrite files. I'm not allowed to contact borrowers. I can't contact my processors. No one contacted me to help assist on any questions they had on these files.

Q. On Page 157, Line 9:

Question: "And did you either before or after you resigned contact somebody at AmeriPro to help with the transition of those loans?"

Your answer was "No," is that correct?

A.   That is correct.

Q.   And Chad Overhauser tried to contact you and you didn't return his calls, right?

A.   His message was indiscreet, did not ask for anything.

Q.   Well, you didn't call him back, right?

A.   I didn't feel a need to call him back.

Q.   Well, Ali Hedayatifar tried to call you and you didn't call him back, right?

A.   That is correct.  His message was not in regards to any loans in process or any questions he had about them.

Q.   And the president of Tenura Holdings, the parent company, tried to call you and you didn't call him back, either, correct?

A.   Kevin Klein's voicemail to me did not say anything about loans in processing.  So according to help in processing of loans or questions they had, there wasn't anything in voicemail.  I didn't receive any calls to help in processing of these loans.

MR. BEHRENS:  Objection, nonresponsive.

THE COURT:  Sustained.

Q.   (BY MR. BEHRENS)  However, even though you didn't

return those calls, you did contact the builders for whom AmeriPro had been the exclusive lender, and you told them you were leaving, right?

A.   I did.

Q.   And please turn to tab 77 of the notebook.

On December 23, 2014, you e-mailed Oak Mortgage personnel and Mr. Task that you were driving almost 200 miles and dropping in on --

THE COURT:  Hold on.  Hold on.  Hold on.

THE WITNESS:  I'm sorry, sir.  I don't have a 77 unless my counting is bad.

THE COURT:  There's two notebooks.

THE WITNESS:  It goes 76, 78.  77?

MR. BEHRENS:  The one that has 77 in it, right.

THE WITNESS:  This one does not -- this one -- again, my numb -- counting could be bad, but this only goes to 41 and this other just doesn't have a 77 in it.  So I apologize.

THE COURT:  You're saying it's missing it?

THE WITNESS:  I believe so, yes.  75 --

THE COURT:  Let me see if I've got it here.

THE WITNESS:  I'm sorry.

MR. BEHRENS:  May I approach the witness with a copy?

THE COURT:  Sure.

THE WITNESS: Thank you, sir.

MR. BEHRENS: You bet.

Q. (BY MR. BEHRENS) You e-mailed Oak Mortgage that you were driving almost 200 miles and dropping in on all builder contacts, correct?

A. Can I have a moment to read the e-mail, please?

Q. You bet.

A. Thank you very much.

Yes -- can you repeat your question? I've read it --

Q. Right.

A. -- and I think I can answer your question better now.

Q. Now, this is an e-mail not to AmeriPro management but to Oak Mortgage, right?

A. It appears to be, yes, sir.

Q. And you told Oak Mortgage, the competitor of the company you were working for, that you had driven almost 200 miles and were dropping in on all builder contacts, correct?

A. Correct.

Q. You were still under a duty of loyalty to AmeriPro at that time, correct?

A. Yes, sir.

Q. And you told Tom Grant, the president of Centerra Homes, on January 8 or 9 that you're resigning, correct?

A. I don't recall off the top of my head the specific

date.

Q. Well, a few days before you made that call, whatever the date was, Oak Mortgage sent you some scrips to use when you called AmeriPro clients, right?

A. I'm sorry. That insinuates I use some scripts?

Q. My question was: Did Oak Mortgage send you scripts to use when you called AmeriPro clients?

A. To my knowledge, no.

Q. Turn to, if you would, tab 78 of the notebook.

A. 75, 78.

Q. Are you there?

A. Yes, sir. Can I read this? I -- it seems a little long. April 17th, January 8th. I see an e-mail from Jackson to me on April 8th.

Q. Do you see one from Heather Moorman to you in the middle of the page?

A. January 6th, yes, I do. I see that.

Q. And she wrote "Attached you will find a copy of scripts to help you with your transition. These scripts will help you for the following scenarios. And the scenarios she included are relators of pipeline, all other realtors, borrowers in pipeline, all previous clients and database," correct?

A. Correct. That's what she states in her e-mail.

Q. And those scripts included highlighting the benefits,

that was highlighting the benefits of you going to Oak Mortgage, correct?

A.    I wouldn't know.  I didn't receive this e-mail from Heather, and I believe Jackson was reforwarding something to me.  As I don't check my personal e-mail that often and it is a Google account or Gmail account, I believe this went into spam. I don't recall ever reading or seeing this e-mail.

Q.    But Oak Mortgage, your new employer, was sending you scrips to use for borrowers in pipeline and relators in pipeline to highlight the benefits of you moving to a different company, right?

A.    You would have to speak with Heather Moorman.  I don't know why she sent that.  I didn't use -- I don't use scripts.  I don't need to use scripts.  I have relationships with these people.  I don't need to script anything.

Q.    And I don't believe we got this copy from Heather Moorman.  We got it from you, didn't we?

A.    I don't know who provided this document.

Q.    Turn, if you would, to Exhibit 58.  That's a text message exchange between you and Tamela Thompson -- or formally Tamela Taylor of Centerra Homes on January 13; is that correct?

A.    I can't tell who's texting between who there.

Q.    If you turn to Page 204 of your deposition.

A.    Line 15?

Q.    Line 17:  "But this was sent to you while you were

still at AmeriPro -- an AmeriPro -- AmeriPro employee, correct?"

Answer: "Yes."

A. In Line 16: "My Gmail gets a lot of junk mail. Prior to that, I just don't recall receiving it."

"But this was sent to while you were still at AmeriPro, an AmeriPro employee, correct?"

Answer to your question, "Yes."

Q. So you did get it, correct?

A. It made it to my Gmail. Not to my -- I didn't review it or see it. I believe it went to my junk mail.

Q. Well, you responded to her, didn't you?

A. I don't believe -- are we talking about -- what are we talking about right now? I'm sorry.

Q. Right now let's turn to Exhibit 58. That's the text message between you and Tamela Thompson at Centerra Homes, correct?

A. So are we talking about a Gmail or a text message? I'm sorry. I'm confused.

Q. Are you on Exhibit 58, first off?

A. Okay. So we're done with the Gmail?

Q. Exhibit 58. Are you there?

A. Yes. I have Exhibit 58 open, yes, sir.

Q. Tamela Taylor e-mailed or texted, "We've decided to stand down and not do anything until we see what happens on

that as a contact for AmeriPro on your last day at work?

A. I didn't have any intentions. I was asked to meet with somebody, and I took them up on their offer to meet. I didn't mention Oak Mortgage in that meeting.

Q. One last topic:

On December 11, 2014, you had a conversation with Oak Mortgage about it indemnifying you if AmeriPro were to sue you, correct?

A. I don't recall. I'd need to see where you're sourcing that from, please.

Q. And just to be sure, is it your testimony, your sworn testimony that you don't remember having such a conversation? I want to be clear on that.

A. Off the top of my head, I don't recall a specific date and this specific conversation.

Q. I -- okay. Did you have a conversation by which Oak Mortgage would agree to indemnify you if AmeriPro sued you?

A. Correct. There was.

Q. And it was in December 2014, when you had that conversation, correct?

A. I don't recall off the top of my head.

Q. Turn to tab 81.

A. Thank you. I was just --

Q. Second page.

A. Sorry. I'm there.

Q. And on the second page, it says, "Per the phone conversation held on December 11, 2014," and then it goes on to discuss the indemnity below, correct?

A. Correct. It says that in the offer letter indemnity.

Q. And that's your signature at the bottom of that page, correct?

A. Yes, sir, that is my signature.

Q. You did not have Brohn Homes as a customer prior to beginning at AmeriPro, did you?

A. I wasn't working with Brohn Homes. I was working with their sales agents and the referral sources of Brohn Homes --

Q. My --

A. -- Ryan, Robin, Matt and --

Q. My question is about Brohn Homes.

MR. BUNDREN: Let him finish his answer, please.

THE WITNESS: I --

THE COURT: Hold on. Hold on. Hold on.

He is saying to let him finish.

Do you have an objection?

MR. BEHRENS: I do. Objection, nonresponsive.

THE COURT: Sustained.

Q. (BY MR. BEHRENS) My question is about Brohn Homes. You did not have Brohn Homes as a customer before you began at AmeriPro, did you?

A. Defining customer is -- I can't answer your question without definition of customer.

Q. Were you the preferred -- I'm sorry. Were you the preferred lender for Brohn Homes before you began at AmeriPro? You were --

A. Of Brohn Homes, I assume we're still talking about?

Q. That was my question, yes.

A. I was not the preferred lender for Brohn Homes.

Q. And you were not for Seaholm, were you, before you began at AmeriPro, correct?

A. I was not the preferred lender for Seaholm prior to the AmeriPro, correct.

MR. BEHRENS: Pass the witness.

THE COURT: Let's take a break.

We are going to take our morning break and you can step down.

(Break taken from 10:29 a.m. to 10:58 a.m.)

THE COURT: You-all may be seated. You want to come back up.

Well, I should say, are you going to direct him?

MR. BUNDREN: I'll reserve.

THE COURT: Okay. Then go back. Sorry. I should have asked that. You may call your next witness.

MR. BEHRENS: We rest at this point, Your Honor.

THE COURT: Okay. Mr. Bundren, you may call

MR. BEHRENS: Just a few questions, Your Honor.

CROSS-EXAMINATION

BY MR. BEHRENS:

Q. Mr. Task, can you turn to Exhibit 73 which should be redacted. Let's see. Yes.

Can you explain why you needed the credit score for a borrower for your salary dispute and what their social security number is?

A. No. But I don't know if this was necessarily something that I was in possession of. I'm not sure. It says Michael Nasserfar requested the report.

Q. Well, we got the copy back from you-all.

A. Right.

Q. And you can't think of any reason related to a salary dispute that you or Mr. Nasserfar has to know the credit score for this borrower?

A. There is no reason.

Q. If you turn to Exhibit 74, is there any reason for you to know the monthly income for your borrower and their social security number for your salary dispute?

A. Not those specific items, no, sir.

Q. But you took it, you and Mr. Nasserfar took it anyway, right?

A. And gave it back. Don't have that anymore.

Q. You gave copies of that bankers box full of financial

128

information from AmeriPro to Mr. Gosnay to scan at Oak Mortgage's offices, correct?

A. We scanned them, correct.

Q. And also explain how you needed for your salary dispute why it is that Oak Mortgage has that copy of our profitability report on its computers?

A. I have no idea.

MR. BEHRENS: Okay. Pass the witness.

THE COURT: Anything else?

REDIRECT-EXAMINATION

BY MR. BUNDREN:

Q. Mr. Task, would you look at 31, please, Plaintiff's Exhibit 31. We will give it on the screen here.

I believe this is a letter to you dated January the 20th of 2015 from the general counsel, let me just pronounce it that way, of AmeriPro; is that right?

A. That's right.

Q. When you received this letter -- well, what did you understand this letter to be demanding that you do?

A. Well, it said --

MR. BEHRENS: Objection. The document speaks for itself and best evidence.

MR. BUNDREN: I am just asking him what he understood he was supposed to do after he received the letter.

THE COURT: With the letter?

name.

Q. That would require dissolving a contract by which AmeriPro purchased it from you, correct?

A. Is there a sale return option on there? Because if that's the case, I'd like for you to sell it back to me.

Q. You understand that AmeriPro takes the position that you were not in good standing with the company when you left?

A. Is that a question?

Q. You understand that, don't you?

A. If that's what you're telling me, I understand it.

Q. Is it your position that if AmeriPro didn't pay you what you thought you were entitled to, that you were free to give its internal confidential documents to a competitor?

A. That's not why I did what I did.

Q. I'm sorry?

A. I didn't give one because of the other.

Q. But you did give confidential information to Oak Mortgage? You gave, for instance, a loan profitability report, right?

A. I think there's a debate about what we feel is confidential, and that's for lawyers to decide. I don't agree with your definition of confidentiality.

Q. Okay. Would you turn to Exhibit 72.

In the upper right-hand corner of Exhibit 72, it says "Nasserfar personal e-mail," correct?

A. Yes.

Q. Correct?

A. Nasserfar personal e-mail.

Q. But instead of personal e-mail, you see that it has several borrower credit reports and loan applications in this file, correct, that you called your personal e-mail?

A. I cannot tell what this is from.

Q. If you go four lines down, it says "credit report," doesn't it?

A. It does say that. I can't tell you where this is housed or formed in order to tell you what the document is or where it exists.

Q. Well, you produced it. This is from your production back to us, a supposed Nasserfar personal e-mail?

A. I don't --

Q. And it instead consists of credit reports and loan applications, right?

A. I don't have this documentation to tell where it's from or what its actual documentation shows.

Q. But you have had it for the last five months, haven't you?

A. No, sir, I have not.

Q. You had it on a USB device, correct?

A. I returned everything off the top of my head.

Q. Okay. You've testified that you've met Clark Wilson

A. Actually, as I stated, I closed the loan prior to meeting with him. And it was Blake Outlaw who had also helped in making the introduction along with another person named Chris Easter who is the sales agent.

Q. And --

A. And in doing so, closing that loan prior to, I asked for a meeting with Clark Wilson. After that meeting in August -- I don't remember the exact date. I just remember being hot and drinking coffee was probably not the best idea on that day, that he said, "Hey, man, I will work with you. That's fine."

So at that point, after meeting with Clark Wilson, I was a preferred lender in his eyes. He would start sending me business.

Q. When you had your meeting with Clark Wilson and then started getting business from Clark Wilson, you were at AmeriPro, correct?

A. Not in August of 2011.

Q. When you starting getting actual loan referrals from Mr. Wilson, were you at AmeriPro?

A. For the majority of the time I worked with Clark Wilson, is that your question? I could have received loans before I started AmeriPro from Clark. I don't recall.

Q. You don't recall if you received any loans before you started at AmeriPro, correct?

A.   That was four years ago.  I remember meeting with him, and that's what I recall off the top my head.

MR. BEHRENS:  I'll pass the witness.

THE COURT:  Anything else?

REDIRECT-EXAMINATION

BY MR. BUNDREN:

Q.   Just one point of clarification.

I want to be clear, Mr. Nasserfar.  At Centerra today, are there sales agents that are referring you business today?

MR. BEHRENS:  Objection, leading.

THE WITNESS:  Yes.

THE COURT:  Overruled.

THE WITNESS:  Yes.  At Centerra today, there are sales agents that refer me business.

Q.   (BY MR. BUNDREN)  And did you get referrals of business from those sales agents before you went to work at AmeriPro when you were somewhere else?

MR. BEHRENS:  Objection, leading.

THE COURT:  Overruled.

THE WITNESS:  Yes.  They referred me borrowers prior to that as well.

THE COURT:  Can we find any questions that I haven't heard ten times already, possibly?  This is not the-last-one-who-speaks-wins.  I'm old, but I am not that

We don't want any of their files. We don't want any of their documents. We have tried to give them back three times, and they haven't even looked at them. We don't want them.

The Court has already ordered that Mr. Whitfield is going to provide to Mr. Rector the images. So what we would like to have the Court order is that AmeriPro review those images under AEO, as the Court has ordered, and identify the files that they contend exist on those images and then tell us what those are. And if we can reach agreement, they can have them. If we have some dispute about whether or not a file is their file or our file -- is it a personal file or not, then we can talk about that later. But tell us what files they think -- they are going to have the images. So what they ought to do is to tell us what files they claim are theirs.

If we agree, we can solve that problem and we can go about our business and prepare for trial. I think that's a great solution to solving that.

I don't want to be back in here being threatened again with a motion to show cause for contempt because we missed some file. Let them search the images and find the files they want and tell us, and then if we agree, we don't have a dispute.

All those files will be returned, if they haven't already been returned. So if there is any file still

just wanted to point that out to the Court.

And it says that in the event the contract is construed, it won't be construed against either parties of the drafter of the agreement. And the Supreme Court has gotten away from that any way with the four corners rule.

Instead of a -- this strict, like rigid, we are going to interpret it one -- against one side or the other. They said, "We're going to look at the four corners of the document and look at what the parties' intent was."

That's all I wanted to point out.

Thank you.

THE COURT: Okay. You're welcome. Okay. So the Court will rule as follows. The Court will grant the temporary injunction as follows:

First of all, I have already ordered and -- for Mr. Rector to have access to the forensic images of all of the respondents' devices and also for the respondents to have access to all forensic images of the respondents' computers that were left, the lab tops -- or I guess they were lab tops, or hard drives, of the computers that belong to the applicant.

I am enjoining respondents from using any of the information that was taken from the applicant. My understanding is that right now it -- all of that information is being held by respondents' counsel and it will stay that way as attorneys' eyes only and nothing will be done. If the

parties can agree once everybody has exchanged forensic images as to what belongs to what party, then I will allow you-all to go ahead and return what is the others as you-all see fit.

I am enjoining the respondents from soliciting business from Brohn Homes, from Seaholm -- the Seaholm condo project, and from Wilson Clark Homes; however, I am not enjoining the respondents from soliciting business from Centerra Homes.

The TRO by the respondents is denied without prejudice for the respondents to apply -- you know, have a hearing on a temporary injunction and bring evidence forward and argue it at that time. I have already ordered, but I will make sure that we are clear. Ordering the applicant to remove any reference to Mr. Nasserfar from the michaelnasserfar.com Web site.

MS. BURTON: I'm sorry, Judge, would you say that -- we agree that we would remove all its videos, likenesses, etcetera.

THE COURT: Any -- any reference to him from the Web site. Anything --

MS. BURTON: From the AmeriPro Web site?

THE COURT: Correct.

MR. BEHRENS: Yes.

MS. BURTON: Okay.

THE COURT: Anything else?

MR. BEHRENS: No, Your Honor.

THE COURT: I think as to the TI and I will just say this to maybe move the ball along and maybe prevent there from being a hearing on your TI. I don't think that it's a bad idea that maybe you-all agree to just -- not get rid of the ".com" but just not go anywhere. You know, put a little -- I have had cases where you just put "This Web site is under construction" and it just doesn't go anywhere. If that's something that you-all might want to agree to that might prevent them from coming back on a hearing as to that and then you-all can dispute -- you know, in trials, you know, the merits, who owns it and, you know, contractually whether he left in good standings or who breached the contract first or what happened.

As to the forms that he made at -- you know, you are welcome to come and argue that. I just don't see how any template that he made while he was working there is going to, on a temporary injunction, be given back to him, but, you know, you are welcome to try that.

I will tell you that I am not keeping this case. So you-all can go argue that in front of another judge, and I am not saying it won't be me. Like I told you-all last time, you had a 30 percent chance of getting me and you got me this time, but if you-all want to go ahead and set that for a hearing, you can do that.

Mr. Behrens, I will need you to draft this order and circulate it to Mr. Bundren for his approval. I will remind you-all of the other things that I had already order as to the forensic imaging those were attorneys' eyes only for Graves Dougherty as to personal information. Nothing wrong with sharing it with general counsel as to anything that's, you know, relevant to this litigation or to AmeriPro.

MR. BEHRENS: Yes, Your Honor --

MR. BUNDREN: Your Honor, we need to have a bond, I believe, and I think that bond needs to be significant if my clients are going to be enjoined from essentially working with respect to some of these -- what I will refer to as referral sources, but I understand the Court's ruling. So I think we need to have a pretty significant bond that is established by AmeriPro.

THE COURT: So what bond is it that you are asking?

MR. BUNDREN: Your Honor, I don't -- I haven't thought about that, but I was thinking a bond of couple hundred thousand dollars will probably be sufficient.

THE COURT: Mr. Behrens, what do you think is an appropriate bond?

MR. BEHRENS: One -- there -- no. There is no basis for that amount. For instance, because they have taken our ability to do business with them --

THE COURT: My question was a simple one.

MR. BEHRENS: Okay.

THE COURT: What do you think the appropriate bond should be? At least I thought it was a simple question.

MR. BEHRENS: $5,000, Your Honor.

THE COURT: I am going to set the bond at $10,000.

Anything else that I have not dealt with?

MR. BEHRENS: Yes, Your Honor. This is pure making sure we are in compliance with federal regulations. We went back and did redacted versions of -- that had borrower names on some of the exhibits. I don't think that should be controversial in terms how that would -- affects either side. It just makes sure that -- like, if there is a Mr. Jones, who had a loan, that Mr. Jones' name is not in the public record.

THE COURT: So what is that you are asking me to do?

MR. BEHRENS: I am asking -- Mr. Garcia has some redacted copies of certain exhibits and --

MR. GARCIA: 28, 30 --

MR. BEHRENS: I'm sorry.

MR. GARCIA: -- it's 28, 30, 36 and 37.

MR. BEHRENS: Yes, I'm sorry. It's -- we'd ask that the existing copies of Exhibits 28, 30, 36 and 37 be withdrawn and that the exact same exhibit be submitted in

redacted form that takes out the borrower names. So that if someone goes through the public record, they wouldn't be able to see a borrower and that really is to comply with a federal regulation that says "A list or grouping of borrowers should not be disclosed."

THE COURT: Do you have, Mr. Bundren, any objection to that?

MR. BUNDREN: I don't have any objection to substituting stuff out for redacts.

THE COURT: Okay.

MR. BUNDREN: Potentially that information.

THE COURT: Okay. So as to 28, 30, 36 and 37, if you will provide the redacted version with a signature okaying it from both sides if that is the redacted version, then we will go ahead and substitute it.

Is that going to be a problem?

(Off the record discussion.)

Okay. Let's go ahead and do that now.

MR. BUNDREN: One other question, Your Honor.

THE COURT: Yes, sir.

MR. BUNDREN: One other question on the injunction, Your Honor. The nonsolicitation provisions of this contract only apply for one year from the time they terminate and they expire after one year. While I can't say that I agree with the Court's injunction, I think that the injunction needs

to expire on the anniversary of their termination and that language needs to be in the order.

THE COURT: I think you-all need to get this settled before then. I am going to order you-all to mediation. So you-all can figure that out before the year is done. And I know I don't need to talk to you-all about this, but the language of the temporary injunction is going to be very specific as to what the contract says which is soliciting. You-all can argue about what that means from here till tomorrow. You-all can argue about whether the year was based starting, I guess on the 15th? Is that the date?

MR. BUNDREN: For -- for this --

THE COURT: January 15th. I am assuming that you-all can argue that since they have been not complying with that, but it shouldn't run, but I will let that argument be for another day. So I am not going to -- I am not going to add that language into my temporary injunction, but I am going to order you-all to mediation.

Anything else?

MR. BEHRENS: No, Your Honor.

MR. BUNDREN: Nothing else, Your Honor.

THE COURT: Can you-all take this stuff away from me, please.

Let me make sure so we are good with the exhibits. And actually, we're going to -- I'm going -- these

are the following exhibits that have been withdrawn. We have already substituted 28, 30, 36 and 37. 25 and 26 Applicant's, both are withdrawn. So I don't want those.

As to the respondents, I have got 28, 29, 20 through 25, and 70 through 75, and I am actually going to withdraw 26 as well. Those will all be withdrawn so we wouldn't have any problems with possible confidentiality issues.

Okay. Anything else from me?

You-all are excused.

(End of proceedings at 4:32 p.m.)